## WILLIAM GREENFELD *v.* MABEL HOOK.

[No. 13, October Term, 1939.]

118

*Decided October 27th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Foster H. Fanseen* and *Philip S. Ball*, for the appellant.

*Benjamin C. Howard* and *George E. Kieffner*, with whom were *Miles & O'Brien* and *Pearre, Kieffner & Jacobs* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This case grows out of a collision between two automobiles in the intersection of Lafayette Avenue and Eutaw Place in Baltimore City at about nine o'clock in the evening of June 8th, 1938. One machine, driven by Mrs. Mabel Hook, who was returning to her home in Ellicott City from a visit to her daughter, a patient in the Women's Hospital in Baltimore, was proceeding west on Lafayette Avenue, the other, driven by Dr. Wil-

liam Greenfeld, was proceeding south on Eutaw Place, when the collision occurred.

Eutaw Place, running north and south, at that intersection is a dual highway, with northbound and southbound driveways separated by a grass plot seventy-four and one-half feet wide. The northbound driveway is twenty-seven feet wide. The driveway of Lafayette Avenue at the intersection is thirty-nine feet wide. Eutaw Place at that point and at that time was a boulevard or "stop" street, traffic on and across it was affected by the provisions of Code (Supp. 1935), art. 56, sec. 209, and its character was indicated by "stop signs" placed at the entrance of the intersection. There is a slight down grade on Eutaw Place from Lafayette Avenue to Mosher Street, the first intersecting street to the north, and the view between those points is unobstructed.

Mrs. Hook, who lived in Ellicott City, was not familiar with that part of Baltimore, and Mr. Charles B. Spicer, a friend whom she met at the hospital, offered to drive ahead of her and guide her across the city. She accepted the offer and followed his car until he reached Eutaw Place. He and she both knew that that was a boulevard or "stop" street, so when he reached the east curb of the northbound driveway of Eutaw Place he stopped, and Mrs. Hook who was immediately behind him also stopped. After ascertaining that the way was clear, Spicer drove across to the east curb of the southbound driveway, and stopped again, and then crossed that driveway. When he left the east curb of the northbound driveway, Mrs. Hook drove into the space he had occupied and stopped again, and then, seeing no northbound traffic, crossed that driveway and stopped behind Spicer at the grass plot. When Spicer drove on across the southbound lane she moved into the space his car had occupied and stopped again at the east curb of the southbound way. She testified that she then looked to her right and, seeing no southbound traffic approaching, she entered the southbound way and was crossing it when her car was struck by the Greenfeld car. As a result of the collision

Mrs. Hook suffered severe and painful injuries, and subsequently brought this action to recover compensation therefor. The case was tried before the court and a jury, the trial resulted in a verdict and judgment for the plaintiff, and from that judgment this appeal was taken.

At the close of the whole case the court granted two prayers for the plaintiff, three for the defendant, refused defendant's A and B and first and fourth prayers, and overruled his special exceptions to the plaintiff's first prayer. Those rulings are the subject of the only exception argued in this court. The defendant's A and B prayers deny a recovery, the A prayer on the ground that the uncontradicted evidence showed that the plaintiff was guilty of negligence directly contributing to the happening of the accident, his B prayer on the ground that there was in the case no evidence legally sufficient to entitle the plaintiff to recover.

Plaintiff's first prayer, which was granted, and defendant's first prayer, which was refused, invoke a construction of that part of Code, art. 56, sec. 209, which deals with arterial highways. The contention of the plaintiff, appellee, here, as embodied in her first prayer and approved by the court, is that "persons travelling upon a boulevard or through street do not have an absolute right of way but that it is the duty of such persons when operating their vehicles upon through or boulevard streets to keep the same under reasonable control and to have the speed of the automobile so reduced in approaching street crossings as to have the same under reasonable control." Defendant's theory, set forth in his first prayer, is that "under the law of the State of Maryland, the operator of a vehicle entering a highway, designated as a boulevard, shall yield the right of way to all vehicles approaching on such highway, except where traffic at such intersections is controlled by traffic signals or officers." His fourth prayer would have denied a recovery "if the plaintiff contributed in any manner to the happening of the accident." Since it made no reference to the facts and circumstances of the collision,

and required no finding of negligence, it was consistent with the theory that, in a collision between a traveller on a boulevard and one crossing the same, the person crossing is under all circumstances, and because of his mere presence, guilty of negligence. Obviously that could not be true and, without further consideration of it, it may be said that that prayer was properly refused.

Consideration of the demurrer prayers involves an examination of all the evidence to discover whether, conceding the truth of so much of it as supports the plaintiff's case, together with all reasonable and legitimate inferences deducible therefrom, it is consistent with a right in the plaintiff to recover compensation from the defendant for the injuries she suffered as a result of the collision.

There was in the case evidence tending to prove the facts stated above, and also other facts which may be thus summarized:

When Mrs. Hook drove across the northbound driveway and stopped behind Spicer's car, she was far enough from the grass plot to permit a taxicab to drive to her right and between her and the curb of the grass plot. When Mr. Spicer moved on, she said: "I pulled up to the curb—east curb of the grass plot. I pulled into the same position that he had occupied and stopped again." She then said: "At that point, did you look to your right? A. I did. Q. What did you see? A. Nothing coming in my direction. I could see up Eutaw Place about half a block. I do not know whether it was Mosher Street. The way was clear and I proceeded across Eutaw Place. A taxicab passed me on my right, and immediately after the cab passed I was hit. I don't know what kind of a taxicab it was. The taxicab was going quite fast. Q. How about your speed? A. I was in low gear. Q. How far out from the curb where you had stopped, had you proceeded when you were hit? A. I would say halfway across."

On cross-examination she further testified: "Q. Explain to his Honor and the gentlemen of the jury, that

if the cab shot by as you just started across, why the cab was not involved in that accident, if you know? A. Well, the cab was going much faster than I was, and he just missed it. Q. The cab was going much faster than you were, and he just missed it? A. Yes, sir. Q. Missed what? A. Missed the accident—the crash. Q. How do you know that? You never did see the other car —Dr. Greenfeld's car? A. I saw it when it hit me. Yes. Q. When it hit you? A. Yes, sir. Q. Tell us how long did you see it? How far away was it? Just at the moment of the crash? A. At the moment of the crash. Q. Where were you looking then? A. After I had pulled up to the curb, I saw that the way was clear. I was looking ahead of me. Q. Then how did you happen to see his car, if you never looked to the right again? A. I saw it when it was right on me. Q. You saw the lights, didn't you? A. No. Q. What did you see? Were the lights of his car burning, or were they out? A. I couldn't see the lights. * * * Q. Now, Mrs. Hook, you say that you could only see half a block away. What was to prevent you from seeing further, if anything? A. Well, there is quite a bit of—quite a few bushes in that area. Q. Well, now, isn't it a fact that when you started— the front of your car was up to the curb? A. Yes, sir. Q. Then you looked ahead? A. Yes, sir. Q. And you never looked to your right again, did you, until the crash occurred; isn't that correct? When your car arrived at the second lane of traffic—the southbound lane—you said you stopped. That is when you looked to your right and could see half a block away. That's true, isn't it? A. Yes, sir. Q. And nothing was coming? A. Yes, sir. Q. Then you put your car in gear and started out? A. Yes, sir. Q. And looked ahead? A. Yes, sir. Q. And you never looked to your right again, did you? A. No."

Spicer testified that when he reached the southbound lane he stopped and looked to his right, that there was nothing moving as far as he could see, that: "You have got a little obstruction there, due to some bushes, but you can get a pretty clear view down grade, going to-

wards McMechen, you can practically cover that square, and the only thing of any importance in that block, other than a few parking lights on, was a car parked around three or four houses north of Lafayette Avenue, and on the west side of Eutaw Place. That had headlights burning. That car was not in motion. It was not close in to the curb. It was possibly half a car in to the curb, but it was not in motion." Just before he reached the west curb line of Eutaw Place, a taxicab passed him on his right, and when he was about "fifteen, eighteen, or twenty feet past Eutaw Place," he heard the crash of the collision. He stopped and went back and found Mrs. Hook's car overturned at the southwest corner. He "looked in the street for skid marks and the only skid marks were like burnt rubber, where it had been swung across the street. Leading from the impact to where Mrs. Hook's—stopped, the burnt marks were just like if you apply your brakes and keep skidding, you would burn rubber. They were sideways—diagonally. They appear for eighteen or twenty-five feet."

In crossing the southbound driveway Mrs. Hook was travelling at not more than five miles an hour, the taxicab which passed her was going perhaps twenty miles an hour, Greenfeld was travelling at about twenty-five miles an hour when he applied his brakes just before the collision, and Spicer was travelling at about from three to five miles an hour when the taxicab passed him.

Greenfeld testified that as he approached Lafayette Avenue he could see the intersection from about half a block away, but that he did not see Spicer's car, the taxicab, or Mrs. Hook's automobile, that he looked ahead and to his right, but that he did not see Mrs. Hook's car until it was about sixteen feet away. He said that when the collision occurred half of his car was in Lafayette Avenue, and that after the collision he "backed it up a little." Spicer said that, when the two cars stopped after the collision, Greenfeld's car was "to the right of the center" and about half a car length beyond that curb, although he did not say which curb. Officer

Edward Champness, of the "crash squad" of the traffic division of the Baltimore City Police, arrived shortly after the crash, and at that time found Mrs. Hook's car facing north at the southeast end of the grass plot and Dr. Greenfeld's car at the northwest intersection facing south. Other witnesses had said that Dr. Greenfeld's car had been moved, but Champness said he "understood" that it had not been moved before he reached the scene. At that time both parties had been taken to the hospital. Champness saw Greenfeld there and he signed this statement: "I was bound south on Eutaw Place, going to the Lord Baltimore Hotel. I didn't see any automobile. The first thing I knew, I struck another car. I was going about twenty to twenty-five miles an hour. I didn't even have time to apply my brakes. My impression was that the car came from my left."

The same witness proved an excellent diagram of the intersection, and two photographs which showed that the running board and fender back of the right front wheel of the Hook car were damaged, and that the radiator screen and front fenders of the Greenfeld car were crumpled and dented.

Before dealing with the rulings on the prayers it is necessary to consider the relative rights of travellers on a highway designated and appropriately marked by the proper authorities as a "boulevard," "stop street," or "arterial highway," and of travellers entering such a highway from intersecting roads and streets, in the light of the statute as construed in two cases recently decided by this court: *Carlin v. Worthington,* 172 Md. 505, 192 A. 356, and *Blinder v. Monaghan,* 171 Md. 77, 188 A. 31.

The statute, Code (Supp. 1935), art. 56, sec. 209, provides: "Except as hereinafter provided, all vehicles shall have the right of way over other vehicles approaching at intersecting public roads from the left, and shall give right of way to those approaching from the right. * * * The State Roads Commission is hereby authorized and directed to designate main traveled or through highways by erecting at the entrances thereto from intersecting

highways signs notifying drivers of vehicles to come to a full stop before entering or crossing such designated highway, and whenever any such signs have been so erected, it shall be unlawful for the operator of any vehicle to fail to stop in obedience thereto, except when traffic at such marked intersection is controlled by traffic signals or officers. All such signs shall be illuminated at night or so placed as to be illuminated by the headlights of an approaching vehicle or by street lights. The operator of a vehicle entering a highway so designated shall yield the right of way to all vehicles approaching on such highway, * * * provided, however, that within the limits of Baltimore City, the designation and marking of such main traveled or through highways shall be made by the Police Commissioner of Baltimore City." That statute imposes, upon one driving an automobile along or on a highway intersecting such a stop street, arterial highway, or boulevard, the duty of coming to a complete stop before entering the favored highway, and of yielding the right of way to all vehicles travelling thereon.

The two duties, of stopping and of yielding the right of way, are correlated and co-ordinate. That of stopping is to give force and practicability to that of yielding the right of way, by requiring the inhibited traveller, before entering the intersection, to stop in order that he may ascertain whether traffic is approaching over and along the favored highway. The rule could have no other rational purpose, for unless the inhibited traveller yields the right of way to traffic on the stop street, the mere act of stopping would be idle, useless, and futile. The obvious and essential purpose of such rules is to accelerate the flow of traffic over through highways by permitting travellers thereon to proceed within lawful speed limits without interruption. That purpose would be completely frustrated if such travellers were required to slow down at every intersecting highway, and the vast sums which have been spent in their construction in an effort to accommodate the great volume of auto-

mobile traffic, which is so indispensable a part of modern life, would be largely wasted. On the other hand the safety of the travelling public demands that the rules defining the relative rights of travellers on through highways and on highways intersecting them be clear, unmistakeable, and definite. If the duty of stopping and of yielding right of way is positive and inflexible, the inhibited traveller may know that he violates it at his risk, while the traveller on the favored highway may know that he may safely exercise the privilege of uninterrupted travel thereon, which the statute gives. If, however, the relative rights of travellers on the two types of highway are held to depend upon nice calculations of speed, time, and distance, the rule would encourage recklessness and the privilege of uninterrupted travel would mean little more than the privilege of having a jury guess in the event of a collision whose guess was wrong. If the traveller on a stop street were required to slow down and bring his car into control at every intersection there would be no perceptible difference between such a street and any other street on which traffic is controlled by the general rules of the road.

That aspect of the question is emphasized in a very useful annotation to the case of *Morris v. Bloomgren*, 89 A. L. R. 831, at page 838, where the annotator says: "Although rights of way have been given by statutes and ordinances to certain travellers, as, for example, to those approaching an intersection from the right, these have been construed to give only a relative right, dependent upon the particular circumstances, such as speed, and the distance of the vehicles from the intersection. This has worked out unsatisfactorily in its practical application. The elements of speculation as to speed, distance, etc., have rendered the traveller's insecurity almost, if not quite, as great as if no regulations existed. What is required is some further assurance that a right of way does in fact exist and will be respected."

The construction of the statute was considered by this court in *Blinder v. Monaghan, supra,* and *Carlin v.*

*Worthington, supra,* and the contention of appellant apparently rests upon the theory that those cases are in conflict, but they are not.

In *Blinder v. Monaghan,* the plaintiff was a passenger in a taxicab. The cab westbound on Thirty-second Street approached the intersection of that street and Charles Street, which at that point is a "stop" or "boulevard" street. As it reached the intersection, a "Blue Line Bus" of the Baltimore Transit Company, proceeding north, was coming to a stop on the east side of Charles Street and the south side of Thirty-second Street to discharge passengers. At the same time a truck driven by one Caplan, also going north, passed the bus to its left, going at about twenty miles per hour. The cab driver stopped at the intersection and then drove in front of the standing bus, and collided with Caplan's truck, which he had seen coming north before the bus intervened. In dealing with the conduct of the cab driver, this court in that case said [171 Md. 83, 188 A. 34] : "Neither argument nor authority are needed to characterize such conduct as negligent. The appellant suggests that Caplan was proceeding at an unlawful rate of speed, but there are three answers to that, one that there is affirmative testimony that he was proceeding at a lawful speed, the other that, if he had been going more slowly, instead of striking the front of the taxicab he may have struck it in the center or rear, the third that Rose had no right to interfere with the traffic on that street, whether it was fast of slow. In view of the statute, it was incumbent upon the taxicab driver, before he entered Charles Street, to make sure that he would not interfere with either north or south bound traffic thereon, and if for any reason his view of the thoroughfare was so obstructed that he could not observe the traffic on it, it was his duty to wait until the obstruction cleared, or to take adequate measures to discover whether the way was clear. The manifest purpose of the statute is to facilitate and expedite the movement of traffic within and between congested centers of population by setting aside selected

highways as through roads, over which traffic may move without interruption or delay. To accomplish that, it dispenses with the right of way rules applicable to highways generally, and gives the right of way to all traffic on such highways, and, as a necessary police measure for the protection of the travelling public, it provides that no one shall enter such a highway without first stopping and that, having stopped, the operator of any vehicle approaching such a highway, shall yield the right of way to 'all vehicles approaching' thereon. Where, as in this case, the operator of a vehicle enters such a highway in disregard of these explicit and mandatory rules, and collides with another vehicle approaching thereon, the collision can only be attributed to his negligence."

In *Carlin v. Worthington*, the plaintiff's truck was westbound on the Columbia Pike, which was a "boulevard" or "stop" street. Defendant's truck, driven over the Cooksville Road, approached its intersection with the Columbia Pike. There was evidence that both cars reached the intersection simultaneously. The only question considered by the court in that case was whether there was error in the refusal of the plaintiff's second prayer which attempted to define the statutory "rule of the road with respect to favored and unfavored highways." In substance the prayer stated that if the jury should find "that the defendant's truck did not come to a full and complete stop before entering into or crossing such through highway, and if they shall find that the two trucks collided in or near the intersection of said through highway and said intersecting highway, then their verdict should be for the plaintiff, unless his driver by his negligence directly contributed to the accident." Considering its refusal this court said: "The vice of the prayer is, not that it did not correctly state the rule of the road with respect to stop signs on secondary highways, but that in addition to the violation of the rule of the road at such an intersection, it did not submit the question of the violation of the rule as the proximate cause of the accident."

In the course of the opinion the court, after stating that the weight of authority "seems to be" that the right of a driver on a favored highway is not absolute and that it is to be enjoyed with due regard to the circumstances then and there existing with regard to speed and distance, said: "When the unfavored driver has time, if the favored driver is so far from the intersection that he will not arrive there before the crossing is cleared by the other, if he is not speeding, it is not negligence of an unfavored driver to enter." But it added: "A driver on an unfavored highway, on entering a favored highway or boulevard, must have his car under control, otherwise he is not prepared to yield the right of way. *McNulty v. Joseph Horne Co.*, 298 Pa. 244, 148 A. 105. It is not negligent for a driver on a primary or favored highway to assume that a driver on a secondary or unfavored highway, marked by a stop sign, will stop and allow him to proceed. *Keir v. Trager,* 134 Kan. 505, 7 P. 2nd 49; *Dikel v. Mathers,* 213 Iowa 76, 238 N. W. 615; *Lucas v. Andress,* 17 La. App. 329, 136 So. 207. It is the application by statute of the old 'stop, look and listen' rule with respect to railways, which is, as stated in *Philadelphia, W. & B. R. Co. v. Hogeland,* 66 Md. 149, 161, 7 A. 105, 107, 'It is negligence *per se* for any person to attempt to cross tracks of a railroad without first looking and listening for approaching trains; and, if the track in both directions is not fully in view in the immediate approach to the point of intersection of the roads, due care would require that the party wishing to cross the railroad track should stop, look and listen before attempting to cross'."

Comparison of these reveals no inconsistency. In *Blinder v. Monaghan* recovery was denied, not because the car entered the boulevard without stopping, but because it failed to yield the right of way. In *Carlin v. Worthington* the court was sustained in refusing a rule of the road prayer because it failed to require the jury to find that defendant's failure to stop before entering the boulevard was the proximate cause of the accident.

Both agree upon the principle that a driver on an unfavored highway, who enters a favored highway, must be prepared to yield the right of way to a traveller on the favored highway, and must allow him to proceed, and applies to travellers in such a situation the severest rule known to the common law of America, the "Stop, look and listen" rule applicable to railway crossings.

Indeed the plain and peremptory language of the statute permits no other construction. It says not only that the inhibited traveller must stop before entering a favored highway, but that he must yield the right of way to one travelling thereon. Manifestly one does not yield the right of way if he drives in front of an approaching car and bars its progress, so the statute can only mean that the inhibited traveller must not only stop before entering the favored highway, but that after he has entered it he must exercise reasonable care and diligence to ascertain the approach of traffic thereon, and that after he has discovered or should discover that traffic is approaching he must allow it to proceed.

As pointed out in *Carlin v. Worthington, supra,* that does not mean that the traveller on the favored highway has an absolute, unqualified, and complete right of way, at all times and under all circumstances, over persons who have lawfully entered the street, nor that he can proceed thereon in blind indifference to the danger to which his progress may expose others. There are many situations in which the driver of an automobile entering a favored from an unfavored highway may without negligence be endangered by traffic over and along the same; dense fog may make it impossible for him to discover approaching cars, a child unexpectedly coming into the highway may cause him to stop or to go on, or some defect in the motor, the brakes, or the steering gear of his automobile may prevent his controlling it, or curves or grades may prevent him from seeing approaching traffic. So, where a traveller on a favored highway knows or should know that his progress will endanger a traveller entering the same from a restricted

highway, he must exercise reasonable care to avoid injuring him.

Cases such as *Taxicab Co. v. Ottenritter,* 151 Md. 525, 135 A. 587; *Hendler Creamery Co. v. Friedman,* 160 Md. 526, 154 A. 93; *Jersey Ice Cream Co. v. Bach,* 161 Md. 285, 157 A. 277; *Chiswell v. Nichols,* 137 Md. 291, 112 A. 363; *Jackson v. Leach,* 160 Md. 139, 152 A. 813; *Yellow Cab Co. v. Lacy,* 165 Md. 588, 170 A. 190; dealing with the general right of way rule at intersections, cannot be accepted as controlling the decision here, because under the statute a special and more positive right of way rule controlling traffic on and across "stop" streets supersedes the general right of way rule to which they apply. And as pointed out by Judge Sloan in *Askin v. Long,* 176 Md. 545, 6 A. 2nd 246, 247, the general right of way rule, although made one of law by the statute, "usually resolves itself into one of fact," with the result that that rule has come to be regarded rather as a mere cautionary guide than a peremptory command, and affords little protection to the travelling public.

The Ohio Supreme Court faced a somewhat similar situation in respect to the construction of the Ohio right of way statute. In *Heidle v. Baldwin,* 118 Ohio St. 375, 161 N. E. 44, 58 A. L. R. 1186, and *George Ast Candy Co. v. Kling,* 121 Ohio 362, 169 N. E. 292, the statute was construed as not conferring an unqualified right of way upon a driver approaching from the right. Those cases, however, were reviewed and overruled in *Morris v. Bloomgren,* 127 Ohio St. 147, 187 N. E. 2, 4. The statute defined a "right of way" as the right "to proceed uninterruptedly in a lawful manner in the direction in which it [the automobile] is moving." In the opinion the court quoted, with apparent approval, statements from a dissenting opinion in *Heidle v. Baldwin, supra,* that the rule adopted by the majority relegates the driver approaching from the right "to the same duties as would arise if no statute existed; it deprives him of the advantage of the statute giving him the uninterrupted right of way; it permits the plaintiff to violate the law with

impunity, and places both drivers on an equal plane by requiring ordinary care where their paths converge; it emasculates the statute, and requires the defendant, in such a situation, to exercise ordinary care under the rules of the common law, although he may be driving on the main highway in a lawful manner." 127 Ohio St. 147, at page 153, 187 N. E. at page 4, 89 A. L. R. at page 835; and the court (in *Morris v. Bloomgren*) added: "By a process of judicial construction those cases have nullified the statute, by withholding from the driver possessing the favored right of way the privilege of proceeding without interruption in the direction in which he was moving, and have confined both drivers of converging vehicles to the same care in approaching the intersection that was required before the statute was enacted— namely, that degree of care exacted under the common law. What boots it to the lawful driver who is given an unequivocal right of way, if that right be denied him by judicial interpretation?"

Without further comment, it is the opinion of this court that so much of Code (Supp. 1935), art. 56, sec. 209, as applies to the facts of this case, is mandatory, that it is the positive and imperative duty of a person driving an automobile over an unfavored highway, when he approaches an intersecting highway lawfully designated as a "boulevard" or "stop street," to stop before entering the intersection, and having stopped, to exercise reasonable care and diligence to discover whether traffic thereon is approaching the intersection, and, having entered the intersection, to yield the right of way to such traffic, by permitting it to proceed without interruption, and that that duty persists throughout his passage across the favored way.

Turning now to the prayers, the first question is that of primary negligence raised by the defendant's B prayer. It is consistent with the evidence that the plaintiff's position was or should have been apparent to the defendant for nearly half a square, for as said in *Askin v. Long*, 176 Md. 545, 6 A. 2nd, 249: "The fact that

he looked and did not see, when if he had looked he must have seen, will not excuse one whose duty it was to act on actualities the existence of which were apparent to any one in possession of his senses. *Gitomir v. United Rwys. & Elec. Co.*, 157 Md. 464, 469, 146 A. 279." And if, as plaintiff testified, she had only reached the center of the street at the time of the collision, there was ample space between her car and the west curb of Eutaw Place, through which the defendant could have driven, had he been exercising ordinary care and vigilance, to avoid the collision. There was no error therefore in the refusal of that prayer.

Defendant's A prayer presents more difficulty. If the plaintiff, by the exercise of ordinary care, could have discovered the approach of the defendant's car before she entered the southbound driveway and drove in front of it, she was undoubtedly guilty of contributory negligence if her conduct substantially contributed to the accident. But she said that, before entering the driveway, she looked to her right and saw nothing, although she could see for a distance of perhaps half a block, and that when she saw Dr. Greenfeld's car she saw no lights. It is consistent with the testimony that it took more than three seconds for the plaintiff to reach the center of the driveway, and that when she entered it Dr. Greenfeld was over one hundred feet away. The fact that she failed to see an unlighted car in the night time, when it was over a hundred feet away, is not so inherently incredible as to have no probative force, for their estimates were only approximate, and she may have been going a little slower and he a little faster than those estimates, and the defendant at least is in no position to discredit her testimony, because he said that he did not see a car which was in plain sight while he drove over ninety feet, although he was looking towards it. So that it cannot be said as a matter of law that she was negligent in entering the driveway. After she did enter it, she was bound to exercise reasonable care and vigilance to look for southbound traffic, and, if there was

any, to permit it to proceed. The undisputed testimony is that after she did enter it she did not look to her right. And while the rule in *Taxicab Co. v. Ottenritter, supra*, that one crossing an intersection is not required to look constantly to his right for approaching traffic, is applicable only to the general right of way rule and not to collisions at the intersection of favored and unfavored highways, nevertheless there is a possible inference that, since the whole west half of the driveway was open to the defendant, her negligence did not substantially contribute to the accident (*A. L. I. Restatement of Torts*, vol. 2, sec. 465), but that the defendant could have avoided it, if, after he knew or should have known of her situation, he had exercised ordinary care to avoid a collision. *A. L. I. Restatement of Torts*, vol. 2, sec. 462, comment a. No error, therefore, is found in the refusal of defendant's A prayer.

There was, however, error in granting plaintiff's first prayer. That prayer instructed the jury that "persons travelling upon boulevards or through streets, do not have an absolute right of way," and that it is the duty of persons operating vehicles upon such streets to reduce the speed of their automobiles and have the same under reasonable control in approaching street crossings. There is no such rule, nor any such duty. On the contrary, one driving an automobile over such a highway is entitled to assume that persons entering it from an unfavored highway will stop and yield the right of way. *Carlin v. Worthington, supra*. Moreover the statement that "persons travelling" upon such highways do not have an "absolute" right of way, while sound enough as an abstraction, is exceedingly misleading without some application of it to the facts of the case. The prayer predicates recovery upon the failure of the defendant to "reduce the speed of his automobile and have the same under reasonable control" at intersections. That statement, while consistent with plaintiff's theory, was inconsistent with the law, and the prayer should have been refused. In view of that conclusion, consideration of the special excep-

tions to it is not required, nor is it necessary to consider the suggestion that it may be inferred from the location and condition of the cars that Greenfeld was driving at an unlawful speed, further than to say that on the facts of this case any such conclusion would be pure speculation.

For the reasons stated above, defendant's first prayer correctly stated the right of way rule applicable to automobiles approaching an intersection of favored and unfavored highways, and the court erred in refusing it. Defendant's fourth prayer was incomplete and confusing and was properly refused.

In view of these conclusions it follows that the judgment appealed from must be reversed, and the case remanded for a new trial.

*Judgment reversed and case remanded for a new trial, with costs to the appellant.*