ETHAN WALLACE *v.* ELBERT FOWLER (Two Cases)
SAME *v.* ARTHUR TRAVERS (THIRD PARTY
PLAINTIFF)

ARTHUR TRAVERS *v.* ELBERT FOWLER AND
ETHAN WALLACE (THIRD PARTY DEFENDANTS)

[Nos. 27-30, January Term, 1944.]

98

*Decided March 24, 1944.*

The causes were argued before SLOAN, C. J., DELA-PLAINE, COLLINS, MARBURY, MELVIN, and BAILEY, JJ.

*Paul Berman* for Arthur Travers.

*Eugene A. Alexander, III*, with whom was *Frank F. J. Daily* on the brief, for Ethan Wallace.

*Harry K. Lott* and *Frederick Taylor*, with whom were *Allers & Cochran* on the brief, for Elbert Fowler.

SLOAN, C. J., delivered the opinion of the Court.

We have here four appeals in one record in cases growing out of a collision of two automobiles on the Ritchie Highway near the town of Glenburnie. There were three

suits brought; one by Elbert Fowler, to the use of the Service Fire Insurance Company, against Ethan Wallace for damage to Fowler's car; another suit by Ethan Wallace against Elbert Fowler for personal injuries; Fowler moved for a joint hearing under the authority of the Rules of Practice and Procedure, 1941, Part III, Rule 2, and it was so ordered. A third suit was brought by Arthur Travers, a passenger in Wallace's car against Elbert Fowler for personal injuries. Fowler then moved to have Ethan Wallace made a third party defendant in the Travers' case under the provisions of the Act of 1941, Chap. 344, Code 1943, Supp., Art. 50, Sec. 27, and the motion was granted. The cases as consolidated came to trial by the court sitting as a jury. There was no formal order of consolidation after Travers' suit was brought, but it was agreed at the trial table that the cases be tried together. The result was a judgment in favor of Fowler, to the use of the Service Fire Insurance Company, against Wallace for $485; a judgment in favor of Arthur Travers against Wallace, whom he did not sue, but who was brought in by Fowler, for $1,250; judgments in favor of Fowler and judgment in the case of Wallace v. Fowler, in favor of the defendant, Fowler. Wallace is the appellant in Nos. 27, 28 and 29, and Travers appealed in No. 30, where he had sued Fowler, who in turn brought in Wallace, and ended with a judgment against Wallace with a judgment in favor of Fowler. At the hearing, we had Travers and Wallace fighting for each other against Fowler, and Fowler against both of them.

The cases were tried by the court so that under the Rules of Practice and Procedure, Part III, Rule 9, this court is required to pass on the law and evidence as in appeals from equity.

The facts, as they appear in the record, are that on August 1, 1942, Elbert Fowler, who owned one of the cars here involved, accompanied by Mrs. Rose Elswick, who was driving, had gone from Baltimore to a tea house, which is known as "The Barn," just north of Glenburnie on the dual highway between Baltimore and An-

napolis. They went in there, from whence they started south toward Annapolis, intending to cross over to the other and northbound lanes to return to Baltimore. The Ritchie Highway is a dual highway with two lanes of traffic in each direction, north to Baltimore, south to Annapolis, with a wide grass plot between the pairs of lanes. The left of the lanes, on each side, is for passing other cars going in the same direction, and there are numerous signs so warning motorists. In addition to the public road crossings, there are many cross-overs, to be used when drivers want to go in the opposite direction. In doing this, however, the driver must observe at his or her peril, the statute, Act of 1931, Chap. 428, Code, Art. 56, Sec. 238, of which so much as applies reads:

"(a) A vehicle shall normally be driven in the lane nearest the right hand edge or curb of the highway when said lane is available for travel except when overtaking another vehicle or in preparation * * * or as permitted in subdivision (d).

"(b) A vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety * * *.

"(d) The State Roads Commission may designate right hand lanes for slow moving traffic and inside lanes for traffic moving at the speed indicated for the district under this section and when such lanes are sign-posted or marked to give notice of such designation a vehicle may be driven in any lane allocated to traffic moving in the direction such vehicle is proceeding, but when traveling within such inside lanes vehicles shall be driven at approximately the speed authorized in such lanes, and speed shall not unnecessarily be decreased so as not to block, hinder or retard traffic," with penalties for its violation.

It would be negligent, aside from the statute, for a driver not to do what the statute says must be done. The Act of 1931, Chap. 428, was amended without substantial change by the Act of 1943, Chap. 1007. Code, Art. 66½,

Sec. 168, with a saving clause (Sec. 4) in the latter Act as to all Acts passed prior thereto, and the cause of action herein arose nearly two years before the passage of the Act of 1943.

These sections, 238 of Article 56 and 168 of Article 66½, are just as mandatory as the "Stop" sign at intersections, and what Judge Offutt said of that in the case of *Greenfeld v. Hook,* 177 Md. 116, 125, 8 A. 2d 888, 892, applies with equal force here:

"The two duties, of stopping and of yielding the right of way, are correlated and coordinate. That of stopping is to give force and practicability to that of yielding the right of way, by requiring the inhibited traveller before entering the intersection to stop in order that he may ascertain whether traffic is approaching over and along the favored highway. The rule could have no other rational purpose, for unless the inhibited traveller yields the right of way to traffic on the stop street, the mere act of stopping would be idle, useless and futile. The obvious and essential purpose of such rules is to accelerate the flow of traffic over through highways by permitting travellers thereon to proceed within lawful speed limits without interruption. That purpose would be completely frustrated if such travellers were required to slow down at every intersecting highway, and the vast sums which have been spent in their construction in an effort to accommodate the great volume of automobile traffic which is so indispensable a part of modern life, would be largely wasted. On the other hand the safety of the travelling public demands that the rules defining the relative rights of travellers on through highways and on highways intersecting them be clear, unmistakable and definite. If the duty of stopping and of yielding right of way, is positive and inflexible, the inhibited traveller may know that he violates it at his risk, while the traveller on the favored highway may know that he may safely exercise the privilege of uninterrupted travel thereon which the statute gives. If however the relative rights of travellers on the two types of highway are held to

depend upon nice calculations of speed, time, and distance, the rule would encourage recklessness and the privilege of having a jury guess in the event of a collision whose guess was wrong."

The collision happened at a cross-over, into which the plaintiff Fowler's car was being turned, and which was partly across the center line between the right lanes, when Wallace's car coming from the rear in the left lane was about to pass. Wallace said he didn't see her, wasn't called on even to notice her so long as she was on the right side, until he was about thirty feet away, when he noticed the Fowler car beginning to occupy his right of way, when Wallace, who was driving his own car, blew his horn, pressed the brakes and tried to get out of plaintiff's way, and almost did it. He said he was going thirty-five to forty miles an hour. "We weren't going very fast." Travers agrees with this statement. This testimony was not denied or contradicted by Fowler or Mrs. Elswick. They testified they didn't see Wallace's car until it collided with theirs. On this point Mrs. Elswick had testified that she had a clear view of the road for a considerable distance but Fowler testified that he could not look to the rear in the mirror as he was on the right side of the car. Mrs. Elswick's testimony as to what she saw or didn't see can be gathered from her cross-examination:

"Q. Did you look out and look behind you to see if there was anything coming? A. No.

"Q. You just looked through your mirror? A. Yes, sir.

"Q. And if it was any automobile in your left lane you could see it.

"(The Court) Not necessarily. If there was a car close up, it would have been hidden from you by the left rear panel, would it not?

"(The Witness) No, I could really see the whole road in the mirror, unless the car was over in the grass plot, which I hardly think it was.

"Q. (By Mr. Berman) Well, if the car was close up on you, you may not have seen the front but you could have seen some part? A. If it was anywhere on the road at all I would have seen it.

"Q. Even if it was a foot behind you, you could see some part of it? A. That's right.

"Q. The automobile must have been there? A. He must have been there or my eyesight went back on me completely, or it was there and I didn't see it."

What was said by Judge Parke in *Gitomir v. United Railways & Electric Co.*, 157 Md. 464, 467, 146· A. 279, 280, where the plaintiff pulled away from the curb just in time to meet a car coming from behind, which she said, though she looked she had not seen; "if a witness testified to having looked and not having seen what, if the witness had looked, she must have seen, the conclusion is that either she did not look or did in fact see the car approaching the point of accident." *Webb-Peploe v. Cooper*, 159 Md. 426, 430, 151 A. 235; *Sullivan v. Smith*, 123 Md. 546, 556, 91 A. 456; *Askin v. Moulton*, 149 Md. 140, 143, 131 A. 82; *Askin v. Long*, 176 Md. 545, 551, 6 A. 2d 246.

The driver says she put out her left hand to warn oncoming traffic that she was about to take over its right of way. That is not enough to excuse her. Prudence demands and the statute (Sec. 238 (b), Art. 56, Code, 1939) requires the vehicle shall not leave the right lane until "the driver has first ascertained that such movement can be made with safety." According to her testimony quoted, there was nothing behind her car, so that putting her hand out was what she called elsewhere "an automatic gesture."

The inquiry in these cases is always to find out whether there was negligence resulting in injury; and if so, whose. The trial court seems to have come to its conclusion on the deduction that the "accident was caused by the negligence of Mr. Wallace, who was driving too fast and who did not have his car under control when he attempted to pass or when he approached the Fowler car to pass."

We cannot see these facts that way. It is uncontradicted that he was not exceeding the speed limit, and was well under it. One of plaintiff's witnesses, John E. Utz, a garage operator who came on the scene shortly after the collision, said the debris in the road was "Right around the front of Mr. Wallace's car. In other words, Mr. Wallace's car hadn't moved." "The skid-marks were very short." One witness said about three feet. The car could not have been going very fast if stopped in so short a distance. The Fowler car was about 150 feet away on the grass plot, but that is too speculative a premise on which to base a finding of negligence of the defendant, Wallace. The chances are that the driver did what is often done under the circumstances, took her foot off the brake and her hands off the steering wheel, and the car ran until it stopped itself.

Applying the reasoning of the case of *Greenfeld v. Hook, supra,* to the facts in evidence here, we can reach no other conclusion than that the primary negligence in this case was that of Mrs. Elswick, which is imputed to Fowler, and that there is no legally sufficient evidence that Wallace was negligent at all. The result of this is that all judgments against Wallace be reversed, and all in favor of Fowler reversed, and that Wallace have judgment against Fowler for $405, of which $110 is loss of wages for two weeks, hospital expense $10, damage to car $285, of which $235 should be entered to the use of his finance company, and that the judgment of Travers against Wallace for $1,250 should be reversed and judgment entered for Travers against Fowler for $1,250.

*Judgment in No. 27 reversed.*

*Judgment in No. 28 reversed and judgment against Elbert Fowler for Ethan Wallace for $405, of which $235 be entered to the use of his finance company.*

*Judgment in No. 29 reversed.*

*Judgment in No. 30 reversed as to Ethan Wallace and judgment entered against Elbert Fowler in favor of Arthur Travers for $1,250, Elbert Fowler to pay costs in all appeals.*