SUMAN *v.* HOFFMAN ET AL.

[No. 109, September Term, 1959.]

*Decided January 20, 1960.*

*Motion for rehearing filed February 1, 1960, denied February 17, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Irvine H. Rutledge,* with whom were *E. Stuart Bushong* and *Lane, Bushong & Byron* on the brief, for the appellant.

*Evan Crossley,* with whom were *Crossley & Latimer* on the brief, for Dale L. Shank, one of the appellees.

Submitted on brief by *Edwin H. Miller* and *Miller & Miller* for Lawrence L. Hoffman, the other appellee.

HORNEY, J., delivered the opinion of the Court.

For the injuries sustained in a collision between a motor-

cycle and an automobile, a jury returned a verdict of $3500 in favor of Lawrence L. Hoffman (Hoffman), the passenger on the motorcycle, against both Dale L. Shank (Shank), the operator of the motorcycle, and William A. Suman (Suman), the operator of the automobile. On this appeal we are called upon to decide the correctness of the ruling of the Circuit Court for Washington County in refusing to grant Suman's motion for a judgment *n.o.v.* Shank did not appeal.

On the evening of August 13, 1957, the three parties to this action and a fourth young man—William Henneberger (Henneberger) who appeared as a witness at the trial—were attending the Hagerstown Fair. All were in their late teens and resided in or near Boonsboro, about ten miles south of Hagerstown. About half an hour before they left, the four of them discussed their plans for the remainder of the evening. Suman, who had his father's automobile, was to take Henneberger with him, and Shank was to follow, carrying Hoffman on the tandem seat of the motorcycle. Suman claims that he told Shank that he (Suman) planned to turn in at the road leading into the Boonsboro School in order "to see if there were any couples parked up there" and said he understood Shank to say he would follow him into the school grounds before they all went into Boonsboro. Shank, however, stated that he knew Suman was going to turn off at the school, but that he (Shank) had planned to wait for Suman at Hoffman's house and that Suman "probably got confused" in believing that he (Shank) was going to follow Suman into the school.

At about midnight the boys left the fairgrounds and, in accordance with their prior conversation, traveled without incident until they reached the road leading into the school where the collision occurred. The school road, in relation to the operators of the motor vehicles, intersected the highway on the left at right angles. There was no illumination or markers at the intersection which was constructed of macadam. The weather was clear and the road was dry. The speed of the vehicles was moderate and there was no evidence of any impropriety on the part of either operator other than the movement of the motorcycle in attempting to pass

the automobile and the movement of the automobile in attempting to make a left turn in front of the motorcycle which led to the collision. Shank, who knew the intersection was there, but did not see it on that night, thought that Suman was slowing down to let him pass and made an attempt to do so. On the other hand, Suman, who knew that the motorcycle was following him because he "could see the lights in the mirror" as it came around a curve just as he started to make the turn, stated that he thought the motorcycle was then "about seven or eight car lengths" behind him, meaning thereby (so he further stated) that the motorcycle was not close enough to make him think that Shank was going to pass. The exact testimony of Suman in reply to a question on direct examination, as to what he did when he approached the intersection, will best describe what transpired at that point:

> "I slowed up and I put my hand out and I just started to make the turn and as I did I looked and saw these headlights coming right toward me and I tried to turn back on to the road and not make the turn into the school and there is a ditch and a telephone pole there and so I came back on the road and I made a 45-degree turn instead of a 90-degree [turn] and just about the time I got off the road a little bit he [Shank] ran into me."

Estimates as to when or at what point the hand signal was given ranged from a distance said to be about "two and a half or three times the length of" the court room—estimated by Suman to be 25 or 30 feet but which was actually from 50 to 60 feet according to the trial judge—compared with "six or eight car lengths" as an approximation by Henneberger, to a time said to be "just as I started to pass him" according to Shank compared with the forthright statement by Hoffman that "it [Suman's arm] was already out when I noticed it." In fact Shank admitted that Suman might have given his signal sooner but he could not have seen it because he was traveling to the rear of the center of Suman's automobile where his vision would have been obstructed. Suman ad-

mitted that he did not look to his rear between the time he made his left turn signal—when Shank was "seven or eight car lengths behind" him—and the time he began his turn at the entrance to the school. Immediately after the collision, in which the handle bar of the motorcycle struck the left door and front fender of the automobile, the automobile came to a stop "off the entrance" to the school road and the motorcycle slid out from under the fender.

The sole question presented is the sufficiency of the evidence to sustain the verdict of the jury in favor of Hoffman against Suman. Stated otherwise, if we are to reverse the trial court, as Suman contends we should, we would have to hold as a matter of law that under the evidence in this case Suman had exercised ordinary care in making a left turn by giving Shank an adequate warning of his intention to do so. To so rule is not possible in this case. The question of whether Suman exercised due care was clearly one for the jury as it always is "except when the case is one where reasonable minds would not differ." *Brehm v. Lorenz*, 206 Md. 500, 505, 112 A. 2d 475, 478 (1955). That was not the situation here.

On the contrary, we think there was sufficient evidence of negligence on the part of Suman to take the case to the jury for at least two reasons. There was a question as to his failure to give an adequate signal of an intention to turn left at least 100 feet before turning as is required by Code (1957), Art. 66½, § 228(b). There was also a question as to Suman's failure to look again before turning when he had looked only once (according to his own testimony) after he had seen Shank—or rather the reflection of the motorcycle headlights in the rear-view mirror—some seven or eight car lengths behind the automobile. A ruling that either of these contentions is correct would be enough to justify the action of the trial court in refusing to grant the motion for a directed verdict and thereby sustain the verdict of the jury. We shall, therefore, consider only the second point since it is the more basic question of law.

As we see it, there is little doubt that Suman—even though he may have had good reason for thinking that Shank knew

he was going to turn left into the school grounds—assumed too much in making that turn without looking a second time and as many subsequent times as might have been necessary to be reasonably certain that he could make the turn with safety to himself and other users of the highway. He could not know that Shank had seen his signal if in fact it had not been given properly—and there was evidence that it was not so given. Nor could he be certain that his slowing up would not be misinterpreted to mean an invitation to pass—and there was evidence that it had been so interpreted. Prudence demands and Art. 66½, § 228(a), *supra*, specifically requires that a left turn shall not be made "unless and until such movement can be made with reasonable safety." *Wallace v. Fowler*, 183 Md. 97, 36 A. 2d 691 (1944). What constitutes reasonable safety is, of course, a question for the jury.

In this case both parties have cited *Palmer Ford, Inc. v. Rom*, 216 Md. 165, 139 A. 2d 697 (1958), in support of their respective positions. Suman incorrectly assumed that the statement by this Court in that case—to the effect that an operator of a motor vehicle without looking again might well assume that one following him would not attempt to pass in the face of a left turn signal and in violation of the law as to passing at an intersection—was a rule of law favorable to him. Instead what we really said was that the operator making the turn was not *contributorily* negligent as a matter of law and that it was proper to submit the question to the jury. *Hopkins v. Pearce*, 115 F. 2d 784 (4th Cir. 1940).

It is evident that the requirement of additional looks to the rear—as well as to the front for that matter—along with all of the other pertinent precautionary measures required by law, such as proper signals, appropriate speed and observance of road conditions, ordinarily are matters which ought to be considered by a jury in determining both primary and contributory negligence. In this case, when the several interpretations which might have been given to the somewhat contradictory and conflicting parts of the testimony are taken into account and considered, we think it is apparent that it was proper to allow the jury to determine the question of negligence as was done. See *Wingert v. Cohill*, 136 Md.

308

399, 110 Atl. 857 (1920). Cf. *Crouse v. United States,* 137 F. Supp. 47 (D.C. Del. 1955). See also 1 Blashfield, *Cyclopedia of Automobile Law and Practice,* § 685 (perm. ed., 1948).

For the reasons stated herein the judgment must be affirmed.

*Judgment affirmed, the appellant to pay the costs.*