CALLAHAN, ET AL. *v.* REYNOLDS, ET AL.

[No. 362, September Term, 1968.]

*Decided July 9, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*George W. Shadoan,* with whom were *Shadoan and Mack* on the brief, for appellants.

*Williams J. Rowan, III,* with whom were *Heeney, Mc-Auliffe & McAuliffe* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

Just after dark on a rainy summer night in 1965 the appellee (Reynolds) and Eddie McCulley, his passenger, were northbound on the District of Columbia section of Kenilworth Avenue (Interstate Route 295) heading for a party in Riverdale. Almost immediately after entering Prince George's County Reynolds approached a point

where two of the five lanes diverged to the left to provide access to the Baltimore-Washington Parkway (Temp. Interstate 95). The other three lanes of Kenilworth Avenue continued straight ahead, becoming Maryland Route 201. Reynolds was in the left of those three lanes. Although the posted limit was 45 miles per hour, he was proceeding slowly, about 30 to 35 miles per hour, because of the heavy rain.

Nettie Callahan also was northbound on Kenilworth Avenue. She was headed for her sister's home in College Park which, she thought, made it necessary for her to leave Kenilworth Avenue and continue her journey on the Baltimore-Washington Parkway. With her were her mother, Lula Cooke, and her two teenage daughters. She was in the lane to the right of Reynolds.

The collision occurred as Mrs. Callahan attempted to cross over to one of the two lanes of the access road leading to the Baltimore-Washington Parkway. Neither car was badly damaged; both drivers proceeded to their respective destinations.

The ensuing litigation came on for trial before R. B. Mathias, J., and a jury, on 14 October 1968, in the Circuit Court for Prince George's County. The plaintiffs, appellants here, called Reynolds as an adverse witness.

Reynolds, 26 at the time, testified that on Saturday, 21 August, at about 8:45 p.m., it was dark and "raining pretty hard." He said he did not see Mrs. Callahan "until she pulled in front of * * * [him]." After the collision both drivers pulled off to the side of the road. Reynolds testified Mrs. Callahan said she was sorry she pulled in front of him. He then left the scene of the collision to "call the police." His car was "brand new" and in "good" mechanical condition. What follows is an excerpt from his cross-examination:

> "Q. Now tell the ladies and gentlemen of the jury what happened from the time you left your house until the time of the accident and how the accident happened. A. Well, I was going out

Kenilworth Avenue, proceeding north, and when this car swerved right in front of me and I didn't have any choice but to slam on the brakes and I just went right in the back of them, the left side or the left rear, with my right front.

"Q. Where was the damage to your car, Mr. Reynolds? A. Right front.

"Q. Was there any damage on the side at all? A. Right front fender. That is considered front and side.

"Q. So there was damage on the side of your car? A. Yes, sir."

Mrs. Callahan testified her speed was about 30 miles per hour; the collision occurred about four blocks from the point of divergence; she saw no cars behind her or, as she put it, "absolutely no traffic;" her turn signal was operating to indicate a left turn for about four blocks; she "was slowly proceeding into the right lane of Washington-Baltimore Turnpike."

Officer Shaner confirmed the fact that it was dark and that it was raining. He said Mrs. Callahan's left rear fender was damaged and that the damage to Reynolds' car was confined to the right front fender and bumper. He got the impression, at the time, and so testified, that Mrs. Callahan was cutting across Reynolds' lane to get into the entrance to the Baltimore-Washington Parkway.

When the plaintiffs concluded their case, Reynolds rested. In explanation of his direction of a verdict for Reynolds, Judge Mathias, in part, said:

"* * * The trouble of it is where is the negligence on behalf of Mr. Reynolds? The undenied testimony is that he was traveling in the Kenilworth lane, being No. 3, going from east to west, and all of a sudden this car appears in front of him making a left-hand turn and that he was driving this car and I don't remember whether he said 25 or 30 or 35 and 40 miles an

hour on a rainy night with a speed limit on this road of 45 miles an hour."

* * *

"So the Court finds in this case from the evidence that I have heard from the total of the plaintiffs' case, that I find no negligence on behalf of Mr. Reynolds. * * * So I will grant the motion for directed verdict."

We have concluded that Judge Mathias was correct. In arriving at our conclusion we have been mindful of the rule that requires us to consider the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable to Mrs. Callahan. *Trusty v. Wooden,* 251 Md. 294, 297 (1968). She called Reynolds as an adverse witness. As we said in *Williams v. Wheeler,* 252 Md. 75, 80 (1969) :

> "* * * In the absence of some real doubt being cast upon the testimony in question, whether by the testimony of other witnesses and inconsistent circumstances * * * or because the adverse witness' testimony was vague, indefinite and internally contradictory * * * or because the matter testified to was opinion testimony brought out by his own counsel on cross-examination and was contradicted by other circumstantial evidence * * *, it is proper to hold as a matter of law that the party who called the opposing party as his own witness is bound by his testimony."

Mrs. Callahan seems to think there is something discrediting in Reynolds' insistence that he did not see her until she crossed over into his lane, especially as she had her turn signal in operation for about four blocks. Even if we assume that, had the weather been fair, Reynolds might have been under some obligation to become aware of the flashing turn signal behind him, it seems to us unlikely it would have been observable by him through a

rear window stippled by raindrops. In any event it is the testimony of Mrs. Callahan that is unclear. In one place she said there was "absolutely no traffic" behind her; in another she seems to be insisting that Reynolds came up behind her and ran into her. If he was not behind her then he was either in front of her or alongside of her and she had to see him and since it was she who was changing lanes it was up to her to keep clear of him. Code, Art. 66½, § 223 (1967 Repl. Vol.) ; *Wallace v. Fowler*, 183 Md. 97 (1944). We have not found in this record any evidence of primary negligence on the part of Reynolds which, of course, makes unnecessary our consideration of the other issues presented. *Crumpler v. Pierce*, 252 Md. 545 (1969).

> *Judgment affirmed. Costs to*
> *be paid by appellants.*