M. L. BOTTS, Appellant, *v.* FRED H. RUSHTON, Respondent.

No. 3445

August 24, 1946. 172 P. 2d 147.

428

*Lewis & Hawkins,* of Las Vegas, for Appellant.

*C. D. Breeze,* of Las Vegas, for Respondent.

## OPINION

By the Court, TABER, C. J.:

That portion of arterial highway No. 93 lying between Las Vegas and Henderson Townsite is a divided highway with two lanes of traffic, one proceeding southeasterly on the way to Boulder City, the other northwesterly on the way to Las Vegas. The former is commonly known as the Boulder City highway, the latter as the Las Vegas highway. There is a divider strip between the two lanes of traffic. Some 13 or 14 miles southeasterly from Las Vegas two other highways intersect the Boulder City highway, one from the south, the other from the west. The former is a three lane highway, and will be referred to as the Henderson highway. The latter has two lanes; it comes into the Boulder City highway from Gate No. 6 of the Basic Magnesium plant, and will be referred to as the Gate 6 highway. These two intersecting highways are secondary stop sign highways. They do not retain their separate identities all the way to the southwesterly edge of the Boulder City highway, but form a common intersectional area at the junction. The NW-SE width of this area is approximately 250 feet. Northeasterly from and approximately opposite said junction, a road crosses over the divider strip between the Boulder City and Las Vegas highways. Beneath this crossing is a culvert running in the same direction as the divider strip. The crossing will be referred to as the culvert crossing. Across the Las Vegas highway from said crossing, a road continues on northeasterly to a trailer park. Each of the Boulder City and Las Vegas highways has two lanes. All traffic on the Boulder City highway goes toward Boulder City, while that on the Las Vegas highway goes toward Las Vegas.

On the morning of March 22, 1944, between six and seven o'clock, defendant (respondent) and eight other

men were proceeding toward Boulder City in his truck. All nine men were on their way to work at the Boulder dam. Defendant was driving, and for a long time had daily been driving fellow employees to work at said dam, where he also was employed. As he approached the intersectional area on said morning, another car driven by a Mrs. Langford, was approaching on the Henderson highway. It proceeded onto the Boulder City highway before defendant's truck had passed, and defendant, in order as he says to avoid a collision, turned to the left and passed in front of the other car. There was no collision, but before the truck was stopped it passed between the southeasterly culvert-head and a power pole, thence into and beyond a hole in the divider strip. At the far side of the divider strip the truck turned over on its right side. Plaintiff (appellant), one of the occupants of the truck, was injured, and later commenced this action against defendant, owner and driver of the truck. The case was tried without a jury, and the lower court, after considering the evidence and after the judge had personally inspected the scene of the accident, gave judgment for the defendant. From that judgment and from an order denying plaintiff's motion for a new trial this appeal has been taken.

Appellant contends (1) that there is no substantial evidence supporting the trial court's decision; (2) that even if this court be of the opinion that there is some substantial evidence supporting said decision, the conclusion reached by the lower court is so clearly and manifestly wrong as to require reversal. He claims that when defendant reached the intersection of the Boulder City and Gate 6 highways, he was traveling at or in excess of 45 miles an hour; that there was no appreciable slowing down of defendant's truck at any time; that the Langford car was first in the intersection; that defendant could easily have avoided any accident by stopping his truck, or turning to the right, or slowing down so as to allow the other car to pass across the

intersection in front of him; but that instead of doing any of these things, he negligently turned to the left in order to beat the other car across the intersection, and in so doing ran into the hole in the divider strip.

Defendant contends that before reaching the intersection he was traveling about 35 miles per hour, but slowed down to about 25 miles per hour as he entered the intersection; that he entered the intersection first; that when he was about two thirds of the way across the intersection Mrs. Langford, who had stopped at the intersection of the Henderson and Boulder City highways, suddenly started up and drove toward him on the arterial; that he then put on his brakes and turned sharply to the left in order to avoid a collision; that at this time Mrs. Langford's car was almost directly in front of him and so close that he could not reasonably do otherwise than turn to the left; that the speed limit on the Boulder City highway for vehicles carrying men going to work at the Boulder dam was 45 miles per hour.

To better appreciate the contentions of both parties, it is necessary that we briefly summarize some of the pertinent testimony bearing on the question of negligence.

Samuel L. Blanton, called by plaintiff. (Mr. Blanton was in the truck, was injured, and later brought suit against defendant.) Shortly before we reached the intersection, there was a slight movement of the truck. It kind of hesitated, you know, and put us all on the watch. The quick change of speed made me look out and I saw a woman approaching in a car from the intersection. I wouldn't say she was stopping; it seemed to me that she hesitated and then drove on. The next thing that happened, we began to swerve to the left. At this time I would say that the truck was going between 35 and 40 miles per hour. When I first looked out of the front of the truck, we had not yet come into the intersection. The truck was about 40 or 50 feet short of the

intersection when I first saw the other car. I would say that the speed of the truck was about 30 miles per hour when it went across in front of the other car. Rushton would quite often make up the time when he was late. When I first saw the Langford car, it was between the stop sign and the Boulder City highway. I could tell that the driver was a woman. When I first saw her car, it was moving. The truck slowed down considerably while it was making the sharp turn to the left.

Charles F. Christianson (one of the occupants of the truck), called by plaintiff. We got paid twice a month, and paid Rushton $7 each payday. The truck was traveling about 35 miles an hour that morning.

David R. Hardy, called by plaintiff. (Mr. Hardy was one of the occupants of the truck.) At the time of the accident it was daytime—light. I did not notice anything unusual that morning about the speed. Rushton's slowing down is what drew our attention that there was something wrong.

William J. Rose, called by plaintiff. (Mr. Rose was in the truck, was injured, and later brought suit against defendant.) Rushton started out from Las Vegas about ten minutes late that morning. It was daylight. The Langford car was stopped at the intersection when I first saw it. Rushton was just coming into the intersection at that time. The Langford car did not continue to stand where it had stopped; it started across into the highway. When that happened, Rushton made the left-hand turn. I believe it was before we reached the intersection that I first saw the Langford car. We were just entering the intersection when I noticed the other car in the intersection. We were about 100 feet from the other car.

Ellsworth J. Kearns, called by plaintiff. At the time of the accident I was employed as a guard at Basic Magnesium. I was stationed at Gate 6, approximately 200 yards from the Las Vegas-Boulder City highway.

I observed the truck on the morning of the accident for about a quarter of a mile before it reached the intersection. It was going in excess of 40 miles an hour. It entered the intersection at approximately the same speed, and did not slack speed. When I first noticed the Langford car it was moving slow, but it then speeded up at the same time that Rushton entered the intersection. The average speed for motor vehicles along this part of the highway is between 35 and 40 miles an hour. When the truck was just about to enter the intersection, I noticed the Langford car going into the other intersection, and it looked like it was speeded up. Just before this I had been watching the Rushton truck, and hadn't seen the Langford car approaching the highway; but as I looked away from the truck and glanced over to the intersection I noticed the Langford car moving slow, and it looked like it accelerated when it got to the highway, and then I noticed the truck turn over. Cars traveling over the Boulder City highway had the right of way. I distinctly saw the Langford car drive into the highway. It went probably to the center of the highway, and the truck turned off and turned over and then the Langford car went on over across. The truck probably turned to the left to miss the other car, which was already on the highway. This car was close to the highway, and was moving slow; it then speeded up. When I first observed the Langford car it was moving at a very slow rate of speed. It was practically entering the Boulder City highway—probably right on the line of that highway. I would say that the Boulder City highway is from 20 to 24 feet wide. When I looked away from the Langford car I don't believe it had reached the center of the inter- section. I didn't observe the truck as it entered the intersection, but had been observing it until just before that time. When I saw the truck turning over, the other car was going very slow, past the center between the two highways. The truck and the Langford car were the only two vehicles I noticed on the highway that

morning just before the accident. There was very little traffic at that time of the morning. The accident happened a little while before the heavy traffic started.

L. D. Cardwell called by plaintiff. At the time of the accident I was sergeant of the guards at Basic Magnesium. The tire marks made by the truck led from a point approximately at the intersection of the road leading into Gate 6 all the way to the culvert. There was no signs of skidding, but there were definite traction marks all the way to the culvert. The truck had proceeded into the intersection about 30 feet before the tire marks commenced. The stop sign is about 25 feet from the Boulder City highway. It was a clear day—no mist, cloudiness, or fogginess. There were no tire marks on the highway made by the Langford car. The tire marks made by the truck indicated that the driver (Rushton) made an application of the brakes all the way from the point where the marks first showed until the truck went off the highway. It was only in the beginning of the tire marks that there were marks of all four wheels. The tread on the tires was good. The distance from the point where the tire marks first showed and the place where the truck went off the highway was approximately 120 feet. The tire marks commenced on the right side of the center line of the highway going towards Boulder City.

M. Lynn Botts, plaintiff, testifying in his own behalf. My best judgment is that the truck was traveling 45 miles an hour. Shortly before reaching the intersection Rushton took his foot off the gas and put it on the brake, and the car slowed down; then it started going fast. Just as it slowed down I looked out and saw the Langford car coming into the intersection. At this time the truck was between 70 and 80 feet from the intersection. When I first observed the other car, it looked like it was just on the highway. It was in the same lane that we were in. At that time I would say the distance from the truck to the car would be around 280 or 290 feet. Before

we got to the intersection Rushton applied the brakes and the car started to stop. This took just an instant, then the truck gained speed. About 10 feet or so before we reached the intersection I saw the other car; that was after Rushton had applied the brakes. If Rushton had gone straight ahead and turned neither to the right nor the left, he would have hit the Langford car. That car had the right of way because it entered the intersection before we did. At the time I saw the other car I would say it was moving slow. Rushton did not slow down at any time until he applied the brakes—just jerked it is all. We were going up a grade there, but it looked like the other car was going to stop, and then it didn't. Rushton probably drove a little faster that morning than usual, but not much faster. I was not alarmed in any way. When I first saw the Langford car, it was just entering the highway. When I last observed it, it hadn't quite got to the middle of the highway—the middle of the intersection. The truck turned just before the Langford car reached the center of the intersection. On ordinary mornings we traveled between 35 and 40; if we were a little late we would go 45. When Rushton slowed down and put on his brakes, he was between 50 and 75 feet from the intersection. When I observed the Langford car it was coming into the right-hand lane, and that was just before the truck entered the intersection.

Fred H. Rushton, defendant, called by plaintiff as an adverse witness. My truck was a 1935 ton and a half Ford panel, all enclosed up to the two front doors. It was an all steel job, and its weight, unloaded, was 4,750 pounds. When I first saw the Langford car it was about 50 yards from the stop sign. At that time I was about 50 yards from the intersection nearest Las Vegas, and about 150 yards from the other car. I kept my eye on the Langford car as we both approached the intersection. I slowed down from approximately 35 miles an hour to around 25. I watched the Langford car all the time, and

entered the intersection before it did. When I entered the intersection the car was about 200 feet from my truck. When the other car reached the intersection, it stopped for a little while and then started up and started to pull across the intersection. I was almost two-thirds of the way through the intersection when either her foot slipped off the clutch or she stepped on the gas—I don't know, unless she didn't see me, and she just barreled over in front of me. I could see that if I turned right, I would hit her straight on. If I had gone straight ahead, I would have hit her in the driver's seat, so I did everything I could to move to the left to avoid the accident. After I started to turn, the car was still coming toward me. It looked like she was almost into me when I made this turn. My brakes were in good condition. After putting my foot on the brake, I kept it there until I went off the road. Across there from the place I put on the brakes until I went off the road was 50 feet, possibly, maybe a little farther. I never knew there was a hole there in the divider strip. The truck was pretty badly wrecked. The front axle was bent almost into a horseshoe, the top had fallen off and there was other damage. The tires on the truck were in good condition and properly inflated. I usually drove the truck from 35 to 40 miles an hour. I have traveled this highway about twelve years. The stop sign is approximately 100 feet from the east and west center line of the Boulder City highway. My truck was on the right side of the center line, going toward Boulder City. When I observed that a collision was imminent, my truck was about 40 or 50 feet from the car. The Langford car was not on the Henderson highway when I concluded that there might be a collision. It was on the Boulder City highway when I swerved over, right directly in front of me. She had stopped, and it looked to me like she had given me the right of way, but she came right out in front and I could do nothing else but turn to the left. She was directly in front of me at that time, and

I was so close to her that there was no way in the world of stopping my truck in that short distance. I turned almost parallel to the way she was running. I was too far through the intersection to have gone anywhere else except to the left. It was just a matter of hit her or clear her, and doing all I could to keep from having an accident without hurting my men any more than possible. I slowed down coming into the intersection. In order to do so I put on the brakes a little, then I took my foot off the brake but did not put it on the accelerator—just came along in easy. That is when the truck got into a 25 mile an hour motion. I had slowed down to about 25 miles an hour, and when she stopped, I started up again. If she hadn't stopped, I could have gone anywhere else and missed her and not had an accident. I had mechanical brakes on the truck. I would say it would have taken me 75 feet to stop.

George Wimsatt, called by defendant. At the time of the accident I was chief deputy sheriff of Clark County, stationed at Henderson substation. We had control over traffic on the B. M. I. and Boulder City highways. I never knew Rushton or Mrs. Langford before the day of the accident. She was coming toward Las Vegas. After the accident, there were no skid marks, but the truck had made tire marks in its sharp curve to the left. The tire marks started in the right lane, going toward Boulder City, and extended 60 feet before leaving the pavement. The marks began to show about 30 feet before Rushton made his left turn. There were no tire marks before Rushton had gone into the intersection. The tire marks from the place where the left turn commenced to where the truck went off the highway were approximately 30 to 35 feet. There was no rubber burn. The tire marks could have been made by a small pressure of brakes and the momentum of the truck as it was making the turn, because the right-hand track showed the heaviest. The speed of the truck at the time it started to turn over was approximately 10 to 12 miles

an hour. From the time the tire marks began to show until the truck went off the highway, I imagine it was going from 30 to 32 miles an hour. The speed enforced on the Boulder City highway was 35 miles an hour, but that did not apply to workers going to and from the dam, Manganese Ore, and B. M. I. All workers were allowed 10 miles in excess, or 45 miles an hour. The Las Vegas-Boulder City highway is a main artery. All vehicles coming in on stop sign intersecting highways must stop at all entrances on the main highway. The stop sign was approximately 60 feet from the center of the Boulder City highway. Under normal conditions a car going 25 miles an hour can be brought to a stop in 21 feet, a car going 35 miles an hour, in 28 feet. The tire marks commenced in the right-hand lane of the Boulder City highway about 20 feet southeasterly from the place where the northerly line of Gate 6 highway joins the southwesterly line of the Boulder City highway. It was after daylight that we received notification of the accident from Tom Bellis, captain of the police department at Basic Magnesium. We didn't use our head lights while proceeding to the scene of the accident.

■ It is proper that we state our views concerning the law applicable to cases of this kind. It was Mrs. Langford's duty not only to stop at the stop sign, but also to look carefully and permit the Rushton truck to pass, unless the situation was such as to clearly indicate that she could cross with a fair margin of safety. Hoenig v. Kohl, 182 Wash. 245, 46 P. 2d 728; Avent v. Tucker, 188 Miss. 207, 194 So. 596; Meyer v. Hartford Bros. Gravel Co., 144 Neb. 808, 14 N. W. 2d 660; Riley v. McNaugher, 318 Penn. 217, 178 A. 6; Higgins v. Jones, 337 Pa. 401, 11 A. 2d 158; Mellott v. Tuckey, 350 Pa. 74, 38 A. 2d 40; Rich v. Hall, 107 Vt. 455, 181 A. 113; Genovese v. Daigle, La. App., 17 So. 2d 736; Cole v. Sherrill, La. App., 7 So. 2d 205; Dixon v. Futch, La. App., 166 So. 205; Marsiglia v. Toye, La. App., 158 So. 589; Greenfeld v. Hook, 177 Md. 116, 8 A. 2d 888, 136

A. L. R. 1485; Madge v. Fabrizio, 179 Md. 517, 20 A. 2d 172; 5 Am. Jur. 669, nn. 15, 16.

■ Appellant cites sec. 4358, N. C. L. 1929, which reads: "Where two vehicles are approaching on any public street or highway so that their paths will intersect and there is danger of a collision, the vehicle approaching the other from the right shall have the right of way." Such statutory provisions do not apply to cases where the accident occurs at the intersection of a through highway and an intersecting stop highway. Peltier v. Smith, Ohio App., 66 N. E. 2d 117.

■ Nor does the rule that the first automobile to enter the intersection has the right of way apply in this case. Ambra v. Woolsey, 55 Cal. App. 2d 104, 130 P. 2d 152; Genovese v. Daigle, La. App., 17 So. 2d 736; Cole v. Sherrill, La. App., 7, So. 2d 205, 210, 211.

■ A driver on a through or arterial highway who is driving at lawful speed and in a lawful manner has the right of way at an intersection with a secondary stop sign highway, and is entitled to assume that a driver on the latter will obey the law until the contrary appears, or should appear, to a reasonable man in his position. If the favored driver, keeping a careful lookout as he approaches or enters the intersection, sees or becomes aware of anything indicating that the driver on the secondary highway does not intend to yield the right of way, he is bound to use the care of an ordinary prudent person in endeavoring to avoid an accident. If the driver on the favored highway is himself free from negligence in approaching the intersection, he has the right to presume that the driver on the disfavored highway will yield the right of way to him and not proceed into the intersection until he can do so without creating a traffic hazard. The purpose of arterial highways is to facilitate through traffic, afford rapid transit, and permit vehicles thereon to move freely, thus accelerating the flow of traffic over such favored highways. As a general rule it is not necessary for drivers on such highways to

stop or slow up as they reach a stop sign intersecting highway in order to ascertain whether or not the driver on the latter is going to stop and yield the right of way. The right of way enjoyed by the driver on the favored highway does not relieve him of the duty to keep a careful lookout so that he may observe whether the driver on the disfavored highway is going to yield the right of way; but he is not obliged to have his car under such control at an intersecting stop sign highway that he may stop at once and so avoid collision with persons who may illegally come into his path. If a driver on a trunk line is proceeding in a lawful manner, there is no rule which requires him to keep his car under such control as to be able to stop within a given number of feet. The favored driver's right of way is not absolute. It is qualified by the requirements previously stated, but subject to those requirements such a driver has the right to proceed uninterruptedly across an intersection with a stop sign highway. And it is not negligence for a driver on a primary highway to assume that a driver on a secondary highway, marked by a stop sign, will stop and allow him to proceed. A driver on an arterial highway is not required to exercise such a high degree of care when approaching or entering an intersection with a stop sign highway as when approaching or entering an intersection with another arterial. Notwithstanding a driver may have the right of way, he may nevertheless be found to be guilty of negligence. Whether he was negligent is nearly always a question of fact. Ambra v. Woolsey, 55 Cal. App. 2d 104, 130 P. 2d 152; Bramble v. McEwan, 40 Cal. App. 2d 400, 104 P. 2d 1054; Bender v. Perry, 37 Cal. App. 2d 206, 99 P. 2d 319; Breker v. Rosema, 301 Mich. 685, 4 N. W. 2d 57, 141 A. L. R. 867; Arnold v. Krug, 279 Mich. 702, 273 N. W. 322; Leitch v. Getz, 275 Mich. 645, 267 N. W. 581; Peltier v. Smith, Ohio App., 66 N. E. 2d 117; Madge v. Fabrizio, 179 Md. 517, 20 A. 2d 172; Sibille v. Highway Ins. Underwriters, La. App., 12 So. 2d 625; Reeves v. Staley, 220 N. C. 573,

18 S. E. 2d 239; 40 C. J. S., Highways, sec. 236, page 257, nn. 52, 53; 5 Am. Jur. 668, n. 12; Anno., 136 A. L. R. 1497.

█ Appellant contends that when Rushton reached the intersectional area he was traveling around or in excess of 45 miles per hour. There is no satisfactory evidence that he was traveling in excess of 45 miles per hour, and the testimony of the witness Wimsatt is uncontradicted that the speed limit of 35 miles an hour did not apply to workers going to and from Boulder Dam, who were allowed 10 miles in excess, or 45 miles an hour. So, even if respondent was traveling 45 miles per hour when he reached the intersectional area, he was not negligent if he was keeping a proper lookout and had not perceived any sign or indication that the Langford car was not going to yield the right of way.

█ The fact that Rushton after first slowing down accelerated his speed does not necessarily show negligence on his part. Sibille v. Highway Ins. Underwriters, La. App., 12 So. 2d 625, 630, 631. It was natural for him to assume that when the driver of the Langford car stopped, she did so with the intention of giving him the right of way. Campbell v. Kozera, D. C., 63 F. Supp. 251; Garrison v. Burns, 178 Va. 1, 16 S. E. 2d 306, 308.

Appellant maintains that Rushton did not have to run into the ditch, he could have stopped his truck or slowed down and allowed the Langford car to pass across the intersection in front of him; also, that he could have turned either left or right and in either course would have missed the divider strip and the Langford car too. Instead of doing any of these things Rushton, according to appellant, tried to beat the Langford car across the intersection, and it was his negligence in so doing that was responsible for the accident. Respecting these contentions respondent admits that "if the Langford car started up when the Defendant's truck was far enough away to enable him to have safely turned to the right

without colliding with the Langford car or to have enabled him to stop his car in time to avoid a collision with the Langford car or to have turned to the left into the cross-highway, as contended by appellant, then the defendant was guilty of negligence in turning to the left and running across and into the middle parking where his truck was upset by striking a hole." But, says respondent, when Mrs. Langford unexpectedly and negligently drove her car onto the right lane of the Boulder City highway, she created an emergency in the face of which respondent, trying to avoid an accident, turned to the left in order to avoid a collision with her car. He claims that in so doing he did all that a reasonable man could be expected to do under the circumstances.

It is undisputed that the accident occurred in the daytime on a perfectly clear morning—"no mist, or cloudiness or fogginess." It was so clear that witness Blanton could not only see the Langford car, but could also see that a woman was driving it; and the officers who were called to the scene of the accident did not use their lights. It is further undisputed that Mrs. Langford's view, for a long distance along the Boulder City highway in the direction of Las Vegas, was wholly unobstructed. She knew that the Boulder City highway was an arterial. She knew, or should have known, that it was her duty to yield the right of way to the truck unless, as a reasonable person, she could see that she had sufficient time to cross the Boulder City highway in front of the Rushton truck.

It is proper also to observe that when Mrs. Langford drove onto the Boulder City highway, she was not proceeding at right angles to that highway. In the first place, she approached from the south to cross the main highway, which runs in a northwesterly and southeasterly direction. Secondly, and calling for particular mention, is the fact that the culvert crossing was so far to her left as she approached the Boulder City highway that

if she had continued in a straight line, her car, instead of moving into the culvert crossing on her way to the Las Vegas highway, would have run into the divider strip on the southeasterly side of the crossing. Even if it could have reached the culvert crossing by continuing across the Boulder City highway in exactly the same direction it had been traveling on the Henderson highway, its front end, while crossing the arterial, would have been closer to the truck than its rear end. That it was in fact still closer is apparent from the fact that it was necessary for the Langford car to turn somewhat to the left before it could enter upon the culvert crossing. These considerations make intelligible the testimony of defendant when he says that if he had gone straight ahead he would have collided "head-on" with the other car, and if he had turned to the right he would have hit that car in the driver's seat.

We add here one further observation, to wit, that neither Mrs. Langford nor any other occupant of her car (if any) testified at the trial.

In support of his contention that respondent was negligent in turning to the left, appellant argues that when the Langford car proceeded onto the Boulder City highway the distance between it and the truck was such as to give respondent ample time to avoid a collision by slowing down, stopping or turning to the right. Rushton testified that his truck was about 40 or 50 feet from the Langford car when he observed that a collision was imminent. Appellant's contention is that when Rushton started his left turn the two vehicles were some 200 feet distant from each other. The latter contention is based mainly upon the testimony regarding the point at which the tire marks started their turn to the left. It is impossible to say exactly how far apart the truck and car were when Rushton saw that Mrs. Langford was proceeding onto the main highway instead of yielding him the right of way. Mr. Blanton testified that when he first saw the Langford car the truck was some 40 or 50 feet short

of the intersectional area. At that time, he says, the Langford car was between the stop sign and the Boulder City highway. If, as appellant says, the Rushton truck was traveling 45 miles an hour, it was going 66 feet per second. In other words, it would travel nearly 200 feet in only three seconds. Presumably it would take the Langford car a few seconds at least to reach the arterial from the point Mr. Blanton saw it approaching from the stop sign. Thus there is substantial basis for the view that when defendant started his sharp turn to the left, his truck and the Langford car were considerably closer to each other than 200 feet. Mr. Rose testified that the truck was just entering the intersectional area when he saw the Langford car in the intersection. At that time, as he says, the two vehicles were about 100 feet from each other. Mr. Kearns testified that the truck was traveling in excess of 40 miles an hour when it entered the intersection, and that it did not slack speed. This would mean that the truck was traveling some 60 feet or more per second. He says that when he first noticed the Langford car it was moving slowly, but accelerated as it reached the highway. He further testified that when he looked away from the Langford car, he doesn't believe it had reached the center of the intersection. The truck, says Mr. Kearns, probably turned to the left to miss the other car, which was already on the highway. Mr. Cardwell testified that the truck had proceeded into the intersection about 30 feet before the tire marks commenced. Mr. Botts testified that when he first saw the Langford car coming into the intersectional area, the truck was between 70 and 80 feet short of that area and that the distance from the truck to the car at that time would be around 280 or 290 feet. Further on in his testimony he said that it was about 10 feet or so before the truck reached the intersectional area that he saw the Langford car. He also said that if Rushton had gone straight ahead and turned neither to the right nor to the left, he would have hit the

Langford car. He further testified that it looked like the other car was going to stop, and then it didn't. When he first saw the Langford car he says it was just entering the highway; when he last observed it, it hadn't quite got to the middle of the highway—the middle of the intersection. He testified that the truck turned just before the Langford car reached the center of the intersection. Mr. Rushton testified that he had mechanical brakes on his truck. Mr. Wimsatt testified that the tire marks began to show about 30 feet before Rushton made his left turn.

Mr. Wimsatt testified that under normal conditions a car going 25 miles an hour can be brought to a stop in 21 feet, a car going 35 miles an hour, in 28 feet. But here we are dealing with the case of a truck which weighed 4,750 pounds unloaded, carrying nine men, and which plaintiff testified was traveling 45 miles an hour. The testimony indicates that the Langford car had not reached the center line of the Boulder City highway when Rushton started making his turn to the left. This testimony, considered with the direction in which the Langford car was traveling, would not make it unreasonable or unnatural for the defendant to turn to the left in his attempt to avoid an accident, Sibille v. Highways Ins. Underwriters, La. App., 12 So. 2d 625; Arnold v. Krug, 279 Mich. 702, 273 N. W. 322.

 Appellant maintains that if Rushton found himself confronted with an emergency, it was the result of his own negligence. But we think there was substantial evidence from which the trial court could reasonably conclude that the emergency was the result of Mrs. Langford's negligence. Rushton was traveling at a rate of speed permitted to vehicles taking men to work. If it be conceded that defendant's truck was less than two thirds across the intersectional area when the emergency arose, that fact is not conclusive on the issue of negligence. Defendant was violating no law, and there is substantial evidence from which the lower court

could reasonably conclude that he did all he possibly could to avoid the accident, after Mrs. Langford had created the emergency. The very fact that Rushton was traveling within the speed allowed by law, and on the right of way highway, is strong evidence that Mrs. Langford entered the intersection at a time when it was unsafe for her to do so. The fact that Mrs. Langford, after first slowing up and stopping, speeded up just as she proceeded onto the Boulder City highway constitutes substantial evidence that she realized she was taking some chance in attempting to beat the Rushton truck across the intersection. Genovese v. Daigle, La. App., 17 So. 2d 736 737; Cole v. Sherrill, La. App., 7 So. 2d 205.

■ Rushton was not a common carrier, but only a private carrier for hire, and it is agreed by the respective parties that his duty to plaintiff was only to exercise ordinary care for his safety.

■ There is a substantial conflict of evidence on material issues of fact in this case, but there is substantial evidence supporting the trial court's findings that defendant exercised ordinary care and that the accident was not the result of any negligence on his part. Under these circumstances it is the general rule that the trial court's findings will not be disturbed. In such cases it is only where the conclusions reached by the lower court are clearly erroneous that a reversal will be decreed. By "clearly," as used in the preceding sentence, we mean beyond all reasonable doubt.

The judgment and order appealed from are affirmed.

HORSEY, J., concurs.

(Successor to DUCKER, J., not yet appointed.)