## HARASZTI *v.* KLARMAN

[No. 35, September Term, 1975.]

*Decided March 5, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Hartman J. Miller*, with whom was *Eugene A. Edgett, Jr.*, on the brief, for appellant.

*Francis J. Meagher*, with whom were *Goodman, Meagher & Enoch* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court.

By Chapter 534 of the Laws of 1970, the General Assembly enacted a new Maryland Vehicle Law, codified as Maryland Code (1957, 1970 Repl. Vol.) Art. 66$\frac{1}{2}$, to take effect from and after January 1, 1971.[1] Substantial portions of the new Article, including those within Subtitle 11 (Rules of the Road) were adopted from, and are identical with, corresponding portions of the Uniform Vehicle Code (1967). Here, upon the issuance of a writ of certiorari to the Court of Special Appeals, we are called upon to review, for the first time, the rights and duties of motorists under one of those sections, Art. 66$\frac{1}{2}$, § 11-202 (a) (2) (i), who, upon approaching an intersection, are faced with a steady yellow traffic signal.

A brief view of the relevant facts giving rise to the questions of law in issue is necessary.

At approximately 11:05 P.M., on the clear, dry, evening of June 25, 1971, the appellant (the defendant in the trial court), Dr. Joseph Haraszti, together with his wife, was operating his 1968 Oldsmobile, northbound and upgrade on Moravia Road, approaching its intersection with Sinclair Lane, in Baltimore City. At the same time, Edward L. Klarman, the appellee (the plaintiff in the trial court), en route to his employment at Washington National Airport, was operating his 1963 Volkswagen convertible, with its top down, southward and downgrade on Moravia Road. As Dr. Haraszti was making a left turn within the intersection, which was controlled by automatic traffic signals, to go westward on Sinclair Lane, the right front of his Oldsmobile collided with the front of Klarman's Volkswagen which was proceeding through the intersection.

Sinclair Lane, both east and west of Moravia Road, was described as 114 feet in width with two driving lanes in each direction. Moravia Road was depicted as being 88 feet wide north of Sinclair Lane and 100 feet wide south thereof; it

---

1. Except for certain provisions, not here relevant, having different specified effective dates. *See* Maryland Code (1957, 1970 Repl. Vol.) Art. 66$\frac{1}{2}$, § 19-107.

accommodated three driving lanes in each direction. Although each of the highways additionally provided left-turn lanes, adjacent to medians, there were no left-turn arrows controlling such turning vehicles.

The automatic traffic signals governing motorists on Moravia Road, facing both north and southbound traffic, were suspended from a common cable hung midway across the intersection; the signals controlling traffic on Sinclair Lane were suspended from two cables located on the east and west sides of the intersection and respectively faced oncoming traffic. The regular sequence for all the signals was from green, to yellow, to red; then from red to green.

The evidence adduced at trial, though conflicting, indicated that Klarman, the plaintiff, was proceeding at "about 35 to 40 m.p.h." southward on Moravia Road and that, when about 100 yards north of the intersection with Sinclair Lane, he observed the traffic signal as "green" for his approaching vehicle. Although he did not continue to watch the signal, he stated that, with his convertible roof down, he saw the "glow of amber" from the signal just before he entered the intersection. Aware of headlights on a vehicle advancing northward, he assumed that that vehicle was proceeding straight through the crossing. Unfortunately, it was this car which "turned out" (in front of him). Klarman could not recall whether there had been a red vehicle, proceeding ahead of him on Moravia Road, which had come to a stop north of the intersection before he entered it.

Dr. Haraszti, called as an adverse party by the plaintiff,[2] testified that he had been driving northward on Moravia Road, within its 35 m.p.h. limit; that he approached the intersection on a green signal, that his left-turn signal had been activated and that as he entered the intersection, the Moravia Road signal turned to "amber;" although he slowed down. he did not come to a stop. He noticed a red vehicle, southbound on Moravia Road come to a stop, north of the intersection line, in the easternmost of the southbound

---

**2.** *See* Maryland Code (1974), Courts and Judicial Proceedings Article, § 9-113, the successor statute to Code (1957, 1971 Repl. Vol.) Art. 35, § 9.

lanes; as he commenced his left turn, to go westward on Sinclair Lane, his vehicle was struck by the southbound Volkswagen. He had not observed the Volkswagen "until a second or two before the impact, when the car was on top of him."

Mrs. Haraszti testified that as their Oldsmobile entered the intersection, the signal changed to yellow, and that thereafter the signal itself, then to the rear of their car, was no longer visible. She corroborated her husband's testimony concerning a red vehicle, southbound on Moravia Road, which had come to a stop north of the intersection. It was her further testimony that as her husband turned left, in front of that standing car, their vehicle was struck by Klarman's car, which she had not noticed until just before the impact.

A disinterested motorist, Aaron Kammerman, facing eastward, in compliance with a red signal had stopped his vehicle on Sinclair Lane, just west of Moravia Road, where he awaited a green signal in order to turn left and proceed northward. With a full view of the signals controlling the intersection, it was his testimony that as the Oldsmobile entered the intersection, the signal was "amber" for vehicles on Moravia Road; that during its passage within the intersection the signal changed to "red for Moravia and green for Sinclair," causing him (Kammerman) to commence his forward motion. At this point he noticed the Oldsmobile, within the intersection, then about 15 yards eastward and slightly to the left of his vehicle. As Kammerman, proceeding on a green signal, advanced a distance of three or four feet into the intersection, he saw "from the corner of his eye" the Klarman vehicle, coming quite fast from his left; it seemed to Kammerman that "it came through the [red] light and [that] the whole wreckage came toward me." He described the entry of the Volkswagen into the intersection as "very fast" and equated it with "a shot in there like a bullet."

Upon this posture of the evidence, the significance of the provisions of Art. 66½, § 11-202 (a) (2) (i) concerning the rights and duties of a motorist entering an intersection upon

a traffic signal showing "steady yellow," is readily apparent. The complete subsection provides:

"(2) Steady yellow indication.

"(i) Vehicular traffic facing a steady yellow signal is thereby *warned* that the related *green movement is being terminated* or that a *red indication will be exhibited immediately thereafter* when vehicular traffic shall not enter the intersection.

"(ii) Pedestrians facing a steady yellow signal, unless otherwise directed by a pedestrian control signal as provided in § 11-203, are thereby advised that *there is insufficient time to cross* the roadway before a red indication is shown, and *no pedestrian shall then start to cross* the roadway." (emphasis added).

At trial, in the Superior Court of Baltimore City, the trial judge (Sklar, J.) related to the jury the pertinent statutory provisions, not only of § 11-202 (a) (2) (i), but as well the provisions of § 11-202 (a) (1) (i) (green signal), § 11-202 (a) (3) (i) (red signal), and those of § 11-402 (a) (the duty of a left-turning vehicle to yield the right-of-way to a vehicle approaching from the opposite direction.) [3]

In expanding upon the provisions of § 11-202 (a) (2) (i), the trial court instructed the jury that if they found "that the Plaintiff entered the intersection with the amber or yellow light facing him at the time he entered . . . and that he could not stop with safety before entering . . . and the accident occurred," their verdict should be for the plaintiff; that if they found that the traffic signal "was amber or yellow prior to the time that he . . . entered the intersection, and if [they further found] that the Plaintiff could have, with the exercise of reasonable care, brought his vehicle to a safe and complete stop, prior to entering the

---

**3.** In enlarging upon the provisions of Code (1957, 1970 Repl. Vol.) Art. 66½, § 11-402 (a), the trial court instructed the jury in substance that when two vehicles are lawfully within an intersection, that vehicle which is proceeding straight through has the right-of-way over vehicles making a left turn.

intersection, and thereby [have] avoided the collision," the verdict should be for the defendant.

Upon exception by plaintiff's counsel, the trial court supplemented its instructions as follows:

> "[I]f you should find from the evidence that the Plaintiff, Mr. Klarman, entered the intersection with the green light in his favor, then your verdict should be for the Plaintiff. If you should find from the evidence that the Plaintiff, Mr. Klarman, entered the intersection against the red light, your verdict should be for the Defendant. Now, if you should find that the Plaintiff, while proceeding south on Moravia Boulevard *had the amber, that is, the yellow light facing him at the time he was entering the intersection but he could not stop with safety, then he had a right to proceed cautiously through the intersection* and in that situation he would be considered as lawfully within the intersection. Now, if you should find from the evidence that the Plaintiff, Mr. Klarman, had the yellow or amber light in his face as he was about to enter the intersection and that *he could have with the exercise of reasonable care brought his vehicle to a safe and complete stop prior to entering the intersection and thereby avoiding the collision,* then you should find for the Defendant." (emphasis added).

The plaintiff renewed his objection to the construction placed by the trial court on § 11-202 (a) (2) (i), in its supplementary charge, and objected as well to the failure of the trial court to grant a proffered instruction which requested that the jury be told that: "[I]f you find that the Plaintiff entered the intersection while the traffic signal for him was yellow, then your verdict must be for the Plaintiff, *as a matter of law,* for the proximate cause of the collision, then, would be the action of the Defendant making a left turn." [4] (emphasis added). From a jury verdict in favor of the defendant, Klarman appealed.

---

4. Plaintiff Klarman's requested Instruction No. 11.

The Court of Special Appeals in *Klarman v. Haraszti,* 24 Md. App. 483, 332 A. 2d 291 (1975) reversed. Concluding that the trial court's supplemental instruction was based upon the former provisions of Code (1957, 1967 Repl. Vol.) Art. 66¹/₂, § 193 (b) (1) and was erroneous, that court held, that under § 11-202 (a) (2) (i) "a motorist facing the yellow light is entitled to enter the intersection and having thus entered the intersection legally is entitled to proceed through regardless of a change in the traffic signal from yellow to red during the course of his passage;" it was further adjudged that the trial court had erroneously rejected the plaintiff's requested instruction.

Prior to 1971, our statute, as it related to an "amber" signal, set forth in Art. 66¹/₂, § 193 (b), provided as follows:

"(b) *Amber alone or 'caution' when shown following the green or 'go' signal.*

"(1) Vehicles facing the signal *shall stop* before entering the nearest crosswalk at the intersection, but *if such stop cannot be made in safety* a vehicle may be driven *cautiously* through the intersection.

"(2) Pedestrians facing such signal are thereby advised that *there is insufficient time to cross* the roadway, and *any pedestrian* then starting to cross *shall yield the right-of-way* to all vehicles." (emphasis added).

In *Eastern Contractors, Inc. v. State, Use of Seifert,* 225 Md. 112, 120, 169 A. 2d 430, 433 (1961), our predecessors pointed out that under the provisions of Art. 66¹/₂, § 193 (b) (1): "[t]he amber interval affords vehicles facing it an opportunity to stop and requires that they stop, 'but if such stop cannot be made in safety a vehicle may be driven cautiously through the intersection.'" Similarly, in *Baltimore Transit Co. v. Putnam,* 250 Md. 19, 23, 241 A. 2d 586, 588 (1968), this Court observed that: "[a] vehicle would be lawfully in the intersection if the driver had either entered it on a green light or if after seeing the signal change to amber he was unable to stop with safety, whereupon he would be permitted to continue 'cautiously' through the intersection." *See also Perlin Packing Co. v. Price,* 247 Md.

475, 485, 231 A. 2d 702, 708 (1967). Although infrequently construed by our predecessors, the clear import of former § 193 (b) (1) commanded that "[a] vehicle facing the green light must stop when it turns to amber, but if it cannot stop safely, then it may be driven cautiously through the intersection." Webb, *"Bothersome Boulevards,"* 26 Md. L. Rev. 111, 119 (1966).

It was recognized in *Eastern Contractors, Inc. v. State, Use of Seifert, supra,* that "[i]f the amber interval is insufficient in the case of wide streets or long or ponderous vehicles, the mere fact that the light may have turned green in favor of traffic moving along the intersecting street does not alter the right to complete the passage." 225 Md. at 120-21, 169 A. 2d at 433. *See also Perlin Packing Co. v. Price, supra; Durham v. United States,* 174 F. Supp. 410, 411-12 (D. Md. 1959); *cf. United States Fidelity & Guaranty Co. v. Continental Baking Co.,* 172 Md. 24, 29, 190 A. 768, 770 (1937).

Just as the prior provisions of § 193 (b) (1) and (2), enacted by Chapter 1007 of the Laws of 1943, were identical with § 34 (b) (1) and (2) of the Uniform Vehicle Code (Rev. ed. 1938), the new statute adopted by Chapter 534 of the Laws of 1970, now codified as § 11-202 (a) (2) (i) and (ii), sets forth verbatim the provisions of § 11-202 (b) (1) and (2) of the Uniform Vehicle Code (1967). *See also* Traffic Laws Annotated, § 11-202 (b) (1972).

In undertaking to ascertain the intent of the General Assembly when it enacted § 11-202 (a) (2), we are here afforded a facility not customarily found in such judicial processes, by recourse to the reports of committees of the Legislative Council, appointed in connection with the revision of the Motor Vehicle Laws, as well as by an Historical Note accompanying § 11-202 (b) (1) of the Uniform Vehicle Code (1967).

On September 1, 1968, when a special committee, appointed by the Legislative Council, popularly referred to as the Warnken Commission,[5] following three years of

---

5. The special committee was so denominated because it was chaired by S. Ralph Warnken, a retired judge of the Supreme Bench of Baltimore City.

intensive study and consideration, submitted its report of recommended Code revisions to the Council, it urged that the "Rules of the Road" (Subtitle 11) in Art. 66$^{1}$/$_{2}$ — within which § 11-202 (a) (2) is included — should be made to conform as closely as possible with the provisions of the Uniform Vehicle Code. The Warnken Commission emphasized that:

> "This is the area of vehicle law in which the need for national uniformity is greatest, and the UVC [Uniform Vehicle Code] has set the standard."

Thereafter, a special legislative committee, appointed by the Council, undertook, during 1969, a detailed review of the Warnken Commission's recommendations. Even though that Committee advocated a number of departures from the provisions set forth in some of the sections of the Uniform Vehicle Code, and made changes to reflect recent revisions in that Code, the provisions of Uniform Vehicle Code § 11-202 (b) (1) and (2) (1967) went unchanged and were adopted by the legislature for codification as § 11-202 (a) (2) (i) and (ii) of the new Art. 66$^{1}$/$_{2}$.

The content of the Historical Note accompanying Uniform Vehicle Code § 11-202 (b) (1) is of significance. It reads as follows:

> "The historical development of Code provisions on the meaning of a yellow signal following a green one indicates a significant change in the behavior expected of a driver facing such a signal.
>
> "The difference between the 1962 Code and the original Code provisions on the meaning of a yellow signal can readily be seen by comparing the two. UVC Act IV, § 12 (a) (Rev. ed. 1930) provided:
>
> > "Yellow or 'Caution,' when shown alone following the green or 'Go' — Traffic facing the signal shall stop before entering the nearest cross walk at the intersection unless so close to the intersection that a stop cannot be made in safety.

"The 1934 and 1938 Codes made the 1930 provision on yellow signals more explicit. Those editions provided:

"(b) Yellow alone or 'Caution' when shown following the green or 'Go' signal.

"1. Vehicular traffic facing the signal shall stop before entering the nearest cross walk at the intersection, but if such stop cannot be made in safety a vehicle may be driven cautiously through the intersection.

"UVC Act V, § 32 (b) 1 (Rev. ed. 1934); UVC Act V, § 34 (b) 1 (Rev. ed. 1938). The first Code provisions on a steady yellow signal following a green one thus provided that, as a general rule, drivers should not proceed through the intersection. The 1962 Code, on the other hand, provides that a steady yellow signal warns a driver that a red signal will be exhibited immediately at which time he shall not enter the intersection. The tacit assumption of the 1962 Code is, of course, that a driver may lawfully enter the intersection on a yellow signal and lawfully continue across it even though a red signal may be shown during the time of such crossing. See UVC § 11-202 (a) 1 (Rev. ed. 1962) requiring drivers facing a green signal on an intersecting street to yield the right of way to vehicles 'lawfully within the intersection.'

"Actually, except for circumstances that would make it unsafe to stop, the original Code provisions on yellow signals required the same conduct on the part of drivers as the Code provision on red or stop signals. Thus, it was not surprising that in 1944, the National Committee *substantially* amended the Code's yellow signal provision:

"Vehicular traffic facing the signal is thereby warned that the red or 'Stop' signal will be exhibited immediately thereafter and such vehicular traffic shall not enter *or be*

*crossing* the intersection when the red or 'Stop' signal is exhibited. (Emphasis added.)

"UVC Act V, § 34 (b) 1 (Rev. ed. 1944). This provision remained in the Code without amendment until 1962 and, in fact, served as the basis for the 1962 Code provision. UVC Act V, § 34 (b) 1 (Rev. eds. 1948, 1952); UVC § 11-202 (b) 1 (Rev. eds. 1954, 1956, 1962). The 1962 Code, however, contains one very *substantial change.* The italicized clause, 'or be crossing,' was deleted by the National Committee in 1962 so that a driver *may now both legally enter the intersection on yellow and legally clear the intersection for use by traffic on intersecting streets even though a red signal is displayed while he is in the intersection.* See discussion by Fisher, *Vehicle Traffic Law* 417 (1961)." (emphasis added).

It thus seems clear from the evolution of the provisions of § 11-202 (b) (1) of the Uniform Vehicle Code, and its adoption verbatim by the General Assembly in recognition of a need for national uniformity, that it was clearly intended to annul the requirement of former § 193 that a motorist facing a steady yellow signal be required to stop and only be permitted to cautiously proceed through such intersection when a stop could not be made in safety. *See Harry Berenter, Inc. v. Berman,* 258 Md. 290, 298, 265 A. 2d 759, 764 (1970).

As the Court of Special Appeals cogently pointed out, while § 11-202 (a) (2) (ii) directing a pedestrian not to "start to cross the roadway," continues the proscription set forth in former § 193 (b) (2), a motorist, under § 11-202 (a) (2) (i) is no longer required to attempt to stop upon a yellow signal, but may lawfully proceed through the intersection.

In addition to this legislative history, the General Assembly set forth a clear directive in Art. 66½, § 19-101, that "[t]he portions of this article which are identical with corresponding portions of the Uniform Vehicle Code shall be interpreted and construed to make uniform the law of those states which enact them." Hence, the decisions of those

states which have adopted provisions identical with, or substantially identical with, our § 11-202 (a) (2) (i) are helpful in our construction of the statute.[6]

---

**6.** Maryland is one of 25 states whose "yellow light" statute is identical with, or substantially identical with, Uniform Vehicle Code § 11-202 (b) (1). (a) Those states which have adopted the identical provision are:

Florida, Fla. Stat. Ann. (1975) § 316.138 (2) (a);

Georgia, Ga. Code Ann. (1933, 1967 Rev. Vol. [1974 Cum. Supp.]) § 68A-202 (b) (1);

Hawaii, Hawaii Rev. Stat. (1968, 1974 Cum. Supp.) § 291C-32 (a) (2) (A);

Kansas, Kan. Stat. Ann. (1964, 1972 Cum. Supp.) § 8-514 (b) (1);

Kentucky, Baldwin's Ken. Rev. Stat. (1974 Cum. Issue) § 189.338 (2) (a);

Missouri, Vernon's Ann. Mo. Stat. (1972, 1975 Cum. Supp.) § 300.155 (2) (a);

Nevada, Nev. Rev. Stat. (1973) § 484.283 (6) (a);

North Dakota, N. Dak. Century Code (1960, 1972 Repl. Vol. [1975 Cum. Supp.]) § 39-10-05 (2) (a);

South Dakota, S. Dak. Compiled Laws (1967, 1975 Cum. Supp.) § 32-28-3 (1);

Vermont, Vt. Stat. Ann. (1967, 1975 Cum. Supp.) tit. 23, § 1022 (b) (1);

Washington, Rev. Code of Wash. Ann. (1970) § 46.61.055 (2) (a).

(b) Those states whose statutes are in substantial conformity are:

Alaska, Alas. Stat. (1972) tit. 19;

California, Ann. Calif. Codes (1971), Vehicles Article § 21452 (a);

Colorado, Colo. Rev. Stat. (1973) § 42-4-505 (3) (a);

Delaware, Del. Code Ann. (1975) § 4108 (a) (2) a;

Illinois, Smith-Hurd Ill. Ann. Stat. (1971, 1975 Cum. Supp.) ch. 95¹/₂, § 11-306 (b) (1);

Maine, Me. Rev. Stat. Ann. (1964, 1975 Cum. Supp.) tit. 29, § 947 (2) (A);

Minnesota, Minn. Stat. Ann. (1960, 1975 Cum. Supp.) § 169.06 5 (b) (1);

New Hampshire, N.H. Rev. Stat. Ann. (1966, 1973 Cum. Supp.) § 262A:9 (b) (I);

New Mexico, N.M. Stat. (1953, 1960 Repl. Vol. [1973 Cum. Supp.]) § 64-16-5B (1);

New York, McKinney's Consol. Laws of N.Y. (1970, 1975 Cum. Supp.), Vehicle and Traffic Law Article, § 1111 3 (b) (1), (2);

North Carolina, Gen. Stat. of N.C. (1975 Repl. Vol.) § 20-158 (b) (2);

Ohio, Page's Ohio Rev. Code (1973, 1974 Cum. Supp.) § 4511.13 (B) (1);

Utah, Code Ann. (1953 Repl. Vol., 1975 Cum. Supp.) § 41-6-24 (b) (1).

Although there is a dearth of decisional law interpreting the import of the change reflected in § 11-202 (b) (1) of the Uniform Vehicle Code, those jurisdictions which have been called upon to interpret the same or substantially similar language have come to conclusions compatible with the intent expressed in the Historical Note, *i.e.*, that a steady yellow signal permits lawful entry into an intersection and merely warns of the impending display of a red signal.

In *Case v. Carter*, 103 Ohio App. 11, 142 N.E.2d 670 (1956), at a time when the Ohio statute (R.C. § 4511.13 (B) (2) read: "(B) Yellow alone or 'caution' when shown following the green or 'go' signal: (2) All other traffic facing the signal is warned that the red or 'stop' signal will be exhibited immediately thereafter . . .," the Ohio Court of Appeals approved a jury instruction which provided:

> "When the yellow or caution light is shown following the green or go signal, a vehicle facing such yellow signal may enter the intersection, however, the operator of such vehicle is thereby warned that the red or stop signal will be exhibited immediately thereafter.

> \* \* \*

> "If a person, operating a car lawfully and at a reasonable speed, enters an intersection on a green or yellow light, he is lawfully in the intersection." 103 Ohio App. at 12, 142 N.E.2d at 672.

In discussing the Ohio statute and the trial court's instruction, that court stated:

> "The statute does not require an automobile to stop at an intersection when faced with a yellow light. It puts such motorist upon notice that a red signal will follow immediately which, in itself, would require caution in entering or in moving through the intersection after entering. Inasmuch as it is the implication of the statute that the automobilist moving into the intersection on a yellow light has

the right to so enter, it follows that he entered lawfully and had a right to continue through the intersection. This construction is strengthened by the fact that Section 4511.13, Revised Code, before its amendment of September 11, 1951, carried a prohibition against entering the intersection until a green or 'go' sign is shown alone.

"We are satisfied then, that the court was correct in charging that the defendant was lawfully within the intersection if he entered it while the light was yellow for him." 103 Ohio App. at 14, 142 N.E.2d at 673.

*See Stann v. Jack P. Taus & Assoc., Inc.,* 79 Ohio L. Abs. 217, 151 N.E.2d 756 (Ct. of App. 1958), citing with approval the holdings in *Case v. Carter, supra,* where the court pointed out that the statute "with respect to the duty of one proceeding on the yellow, or caution, light has been amended by eliminating the requirement for traffic to stop when the yellow, or caution light, is displayed," and concluded that "Stann, although he moved into the intersection on the yellow light, was in the intersection lawfully and Graczyk [the other driver] was then required to yield to him the right of way." 79 Ohio L. Abs. at 219, 151 N.E.2d at 758. *See* as well *Prather v. Phillis Wheatley Ass'n,* 8 Ohio App. 2d 91, 193 N.E.2d 290 (Ct. of App. 1963) (holding that "when the light is yellow, he may proceed through the intersection, but he must do so cautiously and with due regard for the safety of other persons lawfully within the intersection."); and *City of Springfield v. Stovall,* 117 Ohio App. 203, 192 N.E.2d 72 (Ct. of App. 1962) (noting that "a motorist is not required to stop at an intersection when faced with a yellow light.").[7]

Pursuant to a statute virtually the same as the present Uniform Vehicle Code Provision, the California District Court of Appeal in *Fuentes v. Panella,* 120 Cal. App. 2d 175, 260 P. 2d 853 (1953), observed, in *dicta,* that the driver "had

---

7. Subsequent to these decisions, the Ohio statute (R.C. § 4511.13 (B)) was amended, effective July 1, 1974, when the provisions of § 11-202 (b) (1) of the Uniform Vehicle Code were adopted verbatim, thus ratifying the interpretation the Ohio courts had given to the earlier statutory version.

a legal right to enter the intersection if the Bayshore light was either green or amber." 120 Cal. App. 2d at 183, 260 P. 2d at 858.

At a time when Kentucky had no statute controlling motorists facing a steady yellow signal, the Court of Appeals of that state, in *Brockie v. Shadwick*, 396 S.W.2d 63 (Ky. 1965), despite the absence of a legislative directive on the subject, reached a result consonant with the provisions of § 11-202 (b) (1) of the Uniform Vehicle Code and that adopted in *Case v. Carter, supra.* That Court stated:

"It is our opinion that in the situation under discussion (yellow following green) the motorist lawfully may enter the intersection on the yellow light. The purpose of the yellow light is merely to put the motorist on warning that a red signal is coming up and that he must be prepared to stop if the light turns red before he enters the intersection. This is the view taken by the Ohio Court in Case v. Carter, 103 Ohio App. 11, 142 N.E.2d 670." 396 S.W.2d at 65.

From the history of the revisions of UVC § 11-202 (b) (1), the legislative history of the adoption of Art. 66½, § 11-202 (a) (2) (i), and from these decisions, we conclude, as did the Court of Special Appeals, that a motorist facing a steady yellow signal is no longer under the primary duty to stop before entering an intersection, but is now lawfully entitled to enter and proceed through the intersection, even though during the interval of his passage, the traffic signal controlling his movement changes from yellow to red. We similarly conclude that so much of the instruction given by the trial court, which postulated a requirement that the plaintiff stop before entering the intersection, unless "he could not stop with safety," was erroneous, as being outmoded and contrary to the clear intent expressed by the legislature, when § 11-202 (a) (2) (i) was enacted in substitution for former § 193 (b) (1).

Although the new statute permits a motorist, upon a steady yellow signal, to lawfully enter and drive through an

intersection, we see nothing in the history of the adoption of § 11-202 (a) (2) (i) to suggest that such motorist is excused from the requirement of otherwise proceeding with due care in his entry and passage through an intersection.[8]

While § 11-202 (a) (1) (i) provides that vehicular traffic facing a steady green signal "may proceed straight through or turn right or left unless a sign at the place prohibits either such turn. . . . ," and subsection (ii) permits traffic, facing a green arrow to "*cautiously* enter the intersection only to make the movement indicated by the arrow, or another movement as permitted . . ." (emphasis added), the clear import of § 11-202 (a) (2) (i) is that a steady yellow signal puts a motorist on notice that a red signal is about to be displayed and warns him that he must be prepared to stop should the signal change to red before he enters the intersection. As we see it, the statutory change permitting a motorist to enter on a yellow light does not relieve him of the duty otherwise to exercise due care. Indeed, by international recognition, a yellow signal universally connotes the use of caution. In both *Case v. Carter, supra,* and *Prather v. Phillis Wheatley Ass'n, supra,* under a substantially similar statute, the requirement of the use of caution was expressly recognized. Thus, so much of the trial court's instruction which obligated the plaintiff, entering an intersection upon a steady yellow signal to "proceed cautiously through the intersection," correctly delineated the duty imposed upon such an operator, even though the instruction was otherwise erroneous as to the imposition of a duty to stop.

In concluding that the trial court should have granted the plaintiff's proffered instruction, or "one covering the principle in similar language," that a motorist entering an intersection on a steady yellow signal is entitled to a verdict in his favor as a matter of law when in collision with a left-turning vehicle, the Court of Special Appeals was of the view that the intent of the legislature, in enacting the yellow

---

8. Since § 11-202 (a) (2) (i) permits a motorist to *lawfully* enter and drive through an intersection, it follows that the section does not create a criminal offense.

light statute, "was to all but equate the rights of a motorist facing a yellow light to those of a motorist facing a green light." 24 Md. App. 490-91, 322 A. 2d at 295.

In those cases where a standing motorist has received a green signal authorizing him to lawfully proceed, it has been consistently held that he is nonetheless not authorized to enter the intersection, oblivious to other traffic and conditions then existing within that intersection.

In *Valench v. Belle Isle Cab Co., Inc.*, 196 Md. 118, 123, 75 A. 2d 97, 99 (1950), our predecessors pointed out that:

> "A green light does not give an operator of a motor vehicle the right to enter an intersection irrespective of traffic conditions. . . . An operator of an automobile, when given the green or 'Go' signal at an intersection, is required to use due care and caution to see that traffic in the intersection is such that he can proceed with safety. He must regard and heed actual traffic conditions, even though he has a green or 'Go' signal. If a motorist enters an intersection blindly, without anticipating traffic in the intersection, he is guilty of negligence."

Although in *Valench* the Court was confronted with the entry of a motorist into an intersection from a stop, upon the change of the traffic signal from red to green, the Court was concerned with the duty of care owed by motorists lawfully entering an intersection. Relying on the holdings in Valench, this Court, in *Heffner v. Admiral Taxi Service, Inc.*, 196 Md. 465, 472, 77 A. 2d 127, 130 (1950), where a taxicab, proceeding on a green signal, made a left turn and struck a pedestrian within such intersection, pointed out that "a green light does not give a driver the right to drive recklessly through an intersection regardless of traffic conditions . . . [and] [i]f a motorist enters an intersection recklessly without looking out for traffic in the intersection, he is guilty of negligence, even though he had the green light or other signal to proceed."

This duty of using due care upon lawful entry into an intersection, upon the exhibition of a green signal, was

restated in *Katzel v. Clark*, 215 Md. 54, 137 A. 2d 125 (1957). In that case, two automobiles, on intersecting streets, both responding to green traffic signals, collided, when one, which had previously been in a "left turn only" lane, proceeded straight through the intersection and was in collision with the other, which had received a green signal when approximately 20 feet from the intersection. In *Katzel*, the Court pointed out, that although *Valench* holds "that a car lawfully in the intersection may be driven cautiously through, [i]t does not hold that one may enter an intersection lawfully and may then proceed with impunity . . . nor does it mean that another driver, on getting a green light, may enter an intersection only at his peril." 215 Md. at 62, 132 A. 2d at 129. In remanding the case for new trial, the Court went on to state:

> "Whether or not the plaintiff [Katzel] ought to have seen the defendant's [Clark's] car, whether or not his failure to do so was a proximate cause of the accident, and whether or not he was negligent in entering the intersection are questions which we think should have been submitted to the jury. . . ." 215 Md. at 62, 137 A. 2d at 129.

Thus, to the extent that the rights of a motorist proceeding on a steady yellow signal may be equated with those of one proceeding on a green signal, each such motorist, although entitled lawfully to so proceed, must nonetheless exercise due care in both entering, and in transiting, an intersection.

The fundamental distinction lies, as we see it, in the fact that a motorist, proceeding on a green signal is not obligated to anticipate that another driver facing a red signal will ignore it and unlawfully intrude into the intersection, *Baltimore Transit Co. v. Putnam*, 250 Md. 19, 23, 241 A. 2d 586, 588 (1968); *Schwiegerath v. Berger*, 237 Md. 68, 70, 205 A.2d 290, 291 (1964); nor is he under any duty to anticipate that the green signal controlling his movement will turn to red, or that a motorist on an intersecting highway will, during his passage, receive a green signal to proceed. A

motorist about to enter an intersection upon a yellow signal is forewarned that the signal controlling his travel is about to turn red and that vehicles on the intersecting thoroughfare are about to obtain a green signal authorizing them to lawfully proceed.

It is because of this fundamental distinction that we think that the analogy drawn by the Court of Special Appeals with our holdings in *Bennett v. Bass*, 248 Md. 260, 235 A. 2d 715 (1967) is misplaced. In that case, both motorists, from opposite directions, entered an intersection upon a green signal and the car in which the appellant was a passenger made a left turn in front of the oncoming vehicle driven by the appellee who, upon the facts there presented, was found to be free of negligence in proceeding on the green light.

We hold that even though a motorist, facing a steady yellow light, may "lawfully" enter an intersection, he must nonetheless exercise due care when entering and traversing the intersection as does a motorist who enters on a green signal.

Although the Court of Special Appeals, when it gave approval to the plaintiff's proffered instruction, did not engraft thereon the requirement that his entry into the intersection be made with due care, such element was inferentially recognized when that court concluded that "there was no evidence that the appellant [Klarman] was inattentive in the operation of his vehicle." 24 Md. App. at 492, 332 A. 2d at 295.

In reaching such conclusion, that court, on the authority of *Fowler v. Smith*, 240 Md. 240, 246, 213 A. 2d 549, 553-54 (1965) and *Jones v. Baltimore Transit Co.*, 211 Md. 423, 428, 127 A. 2d 649, 652 (1956) held that the "general adjectival descriptions" given by the witness Kammerman portraying the entry of the plaintiff's vehicle into the intersection to be "not sufficient alone to establish that [Klarman] was traveling at an excessive speed." 24 Md. App. at 492, 332 A. 2d at 296.

It is true, as pointed out in *Jones v. Baltimore Transit Co.*, *supra*, that "an inference [of negligence] must be drawn from facts, not from adjectives or other words used by

witnesses to characterize the movement." *See also Miller v. Robinson,* 241 Md. 335, 338, 216 A. 2d 743, 745 (1966); *Kaufman v. Baltimore Transit Co.,* 197 Md. 141, 146, 78 A. 2d 464, 467 (1951).

But in *Fowler v. Smith, supra,* Chief Judge Prescott, in discussing for this Court, the legal sufficiency of evidence of negligence, wrote:

> "Ordinarily [negligence] is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn. *Kantor v. Ash,* 215 Md. 285. Cf. *Suman v. Hoffman,* 221 Md. 302. And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as tending to prove negligence, and the weight and value of such evidence will be left to the jury. *Ford v. Bradford,* 213 Md. 534. Cf. *Bernardi v. Roedel,* 225 Md. 17, 21. However, the rule as above stated does not mean, as is illustrated by the adjudicated cases, that all cases where questions of alleged negligence are involved must be submitted to a jury. The words 'legally sufficient' have significance. They mean that a party who has the burden of proving another party guilty of negligence, cannot sustain this burden by offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture that such other party has been guilty of negligence, but such evidence must be of legal probative force and evidential value. *State v. Hopkins,* 173 Md. 321, and cases cited; *Hevell v. Balto. Transit Co.,* 173 Md. 327; *Haddock v. Stewart,* 232 Md. 139. . . ."

(emphasis in original) 240 Md. at 246-47, 213 A. 2d
at 553-54.

Assuming that Kammerman's adjectival description of
the entry of the plaintiff's vehicle into the intersection had
no probative value as to any excessive speed on the part of
the plaintiff, there was other factual evidence from which
the jury might well have found that the plaintiff had been
inattentive in the operation of his vehicle and had not
entered the intersection with due care. Klarman himself
testified that after taking note of the signal from a distance
of 100 yards, he "did not continue to watch" or notice it and
saw from overhead only the "glow of amber before entering
the intersection." Although Klarman could not recall
whether or not a red vehicle, immediately preceding him on
Moravia Road, had come to a stop before entering the
intersection, Dr. Haraszti — called as a plaintiff's witness —
gave uncontradicted and undiscredited testimony, binding
on the plaintiff,[9] that a red vehicle, preceding Klarman's,
had come to a stop, north of the intersection, ostensibly in
compliance with a change of the traffic signal. This
testimony concerning the stopped red vehicle, was
corroborated by Mrs. Haraszti.

From our view of these facts, there was sufficient
probative evidence for the jury to resolve whether or not the
plaintiff's entry into the intersection had been made while
exercising due care, or whether or not his failure to do so
was a proximate cause of the collision.

Since the conclusion reached by the Court of Special
Appeals, including approval of the requested instruction,
would have precluded the jury from being able to make such
a determination, we conclude that it was error to hold, under
these facts, that the action of the left-turning motorist
would have constituted the sole proximate cause of the
accident and that the plaintiff, by virtue solely of his entry

---

**9.** When one calls an adverse party as his witness, he is bound by his
adversary's testimony unless it is contradicted or discredited. Larsen v.
Romeo, 254 Md. 220, 255 A. 2d 387 (1969); McClearn v. Southeast Concrete
Co., 253 Md. 135, 251 A. 2d 896 (1969).

upon a yellow signal, was thus entitled to a verdict as a matter of law.

*Judgment of the Court of Special Appeals affirmed; costs to abide the result of the new trial ordered by that court.*